1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WEST PACIFIC ELECTRIC COMPANY          No.  1:18-cv-00166-NONE-BAM
     CORPORATION,
12                                          ORDER DENYING DEFENDANTS'
                  Plaintiff,                MOTION FOR SUMMARY JUDGMENT OR,
13                                          IN THE ALTERNATIVE FOR PARTIAL
           v.                               SUMMARY JUDGMENT
14
     DRAGADOS/FLATIRON, et al.,             (Doc. No. 82)
15
                  Defendants.
16

17          This action arises from a construction dispute over a segment of the California High

18   Speed Rail Project extending from Fresno to Bakersfield, also known as the Construction

19   Package 2-3 or CP 2-3 project.  After the California High-Speed Rail Authority ("CHSRA")[1]

20   contracted with defendant Dragados/Flatiron, a joint venture, ("DFJV") to design and build the

21   CP 2-3 project, DFJV in turn subcontracted a portion of the project to plaintiff West Pacific

22   Electric Company Corporation ("WPEC").  The parties' relationship subsequently turned sour.

23   Claiming that it was fraudulently induced into executing the subcontract, WPEC brought this

24   action against DFJV in January 2018 seeking over $1 million in damages.  In response, DFJV

25   brought a counterclaim for disgorgement against WPEC seeking to recover $322,278.71 in

26   payments it had made to WPEC.  Pending before the court is DFJV's motion for summary

27   _____

28   [1]  CHSRA is a public agency and an arm of the State of California.  (Doc. No. 82-3 ¶ 19); see Cal.
     Bus. & Prof. Code §§ 7008, 7059.

judgment in its favor on all of the claims asserted in WPEC's complaint and in DFJV's cross-complaint for disgorgement.  (Doc. No. 82-1 at 8.)  WPEC filed an opposition to the motion on November 20, 2019, (Doc. No. 86), to which DFJV replied seven days later, (Doc. No. 98).

The motion was taken under submission for decision on the papers pursuant to Local Rule 230(g).[2]  Having considered the parties' submissions, relevant law, and the evidence submitted to the court on summary judgment, DFJV's motion will be denied in its entirety for the reasons explained below.

## BACKGROUND

The following summary of facts is based on *undisputed* material facts provided in the parties' joint, additional[3] responses to statements of undisputed material facts, as well as genuinely *disputed* facts drawn therefrom and read in light most reasonably favorable to WPEC for purposes of summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citation omitted).[4]

WPEC initiated this action on January 30, 2018, (Doc. No. 1), even though DFJV did not terminate WPEC from the subcontract until mid-March 2018, (Doc. No. 85 (WPEC's Response to DFJV's Statement of Undisputed Material Facts) ¶ 45).  WPEC's complaint asserts eleven causes of action under California law based on DFJV's alleged misconduct relating to the

---

[2]  The pending motion has been under submission for decision since November 27, 2019.  The long-standing lack of judicial resources in this district, which reached truly crisis proportion in February 2020, has been well chronicled.  *See* http://www.caed.uscourts.gov/caednew/ assets/File/DAD_Amended_Standing_Order_Judicial_Emergency_12_2_2020.pdf.  Nonetheless, the undersigned apologizes for the excessive delay in the issuance of this order.  Unfortunately, the situation sometimes results in the court simply not being able to issue orders in submitted civil matters in an acceptable period of time.  This situation is frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

[3]  DFJV failed to respond to WPEC's statement of additional material facts.  (*See* Doc. Nos. 92, 98-99.)  The court will liberally construe WPEC's additional statement, since WPEC is the non-moving party, and will accept for purposes of resolving this motion the facts therein as true to the extent they are supported by the evidence.

[4]  The court will rely on the parties' pleadings and briefs to capture their claims, theories of liability, and filing dates—but not to resolve any genuine factual disputes.

subcontract:  (1) rescission based on fraud, (2) rescission based on mistake of fact, (3) fraudulent

concealment, (4) violation of California Business & Professions Code § 17200, *et seq.*,

(5) breach of contract, (6) "reasonable value for labor and materials furnished," (7) open book

account, (8) account stated, (9) violation of California Business & Professions Code § 7108.5,

(10) "enforcement of payment bond," and (11) "recovery on contractor's license bond."  (Doc.

No. 1 ¶¶ 2–69.)  At its core, WPEC's theory of liability is that DFJV allegedly concealed material

information about the difficulties WPEC would encounter in performing the subcontract in a

timely manner, and but-for DFJV's fraudulent concealment of that information, WPEC would not

have entered into the subcontract.  (*Id.* ¶¶ 24–29, 35.)  DFJV denies the allegation and counters

with a crossclaim for $322,278.71 in disgorgement of payments made to WPEC under the

subcontract.  (Doc. Nos. 49; 72 at 8–9; 85 ¶ 44.)  DFJV's theory of liability is that WPEC was not

a duly licensed subcontractor as required by California law to perform the subcontract work and,

as a result, WPEC is obligated to disgorge the payments received.  (Doc. No. 85 ¶¶ 6–22.)

**A.      The Subcontract and WPEC's Fraudulent Concealment Claim**

          In June 2015, CHSRA entered into a prime contract[5] with DFJV to design and construct a

60- or 65-mile high-speed rail system connecting Fresno and Bakersfield.  (Doc. Nos. 82-3 (Joint

Statement of Undisputed Material Facts) ¶ 18; 85 ¶¶ 41, 78.)  In August 2016, DFJV published an

invitation for bids to solicit potential subcontractors to excavate and install the CP 2-3 project's

telecommunications utilities.  (Doc. No. 82-3 ¶ 21; *see also* Doc. No. 82-1, Ex. Q.)  WPEC

submitted a bid in September 2016, (Doc. No. 82-3 ¶ 24), and was later awarded the subcontract

by DFJV,[6] (Doc. No. 85 ¶ 158).  The subcontract was executed on November 14, 2016.  (Doc.

No. 82-3 ¶ 28.)  By its terms, the subcontract incorporates by reference the general provisions of

---

[5]  Under California construction law, a "direct" or "prime contract" is a contract "that provides for all or part of a work of improvement" between an owner, which is CHSRA in this case, and a direct contractor, which is DFJV.  Cal. Civ. Code § 8016.  DFJV is considered a direct or prime contractor because it "has a direct contractual relationship with an owner."  Cal. Civ. Code § 8018.

[6]  WPEC is considered a subcontractor under California law because it "does not have a direct contractual relationship with an owner."  Cal. Civ. Code § 8046.

the prime contract.[7]  (Doc. No. 85 ¶ 178; *see also* Doc. No. 93-2, Ex. J (Subcontract), Attach. C at 68–69 (listing documents that are incorporated by reference).)  The five locations along the CP 2-3 project that WPEC was subcontracted to install the telecommunications are:  (1) Peach Avenue, (2) Cairo Avenue; (3) 9th Avenue; (4) Clovis Avenue; and (5) Elkhorn Avenue—the composite plans of the locations were also incorporated by reference into the subcontract.  (Doc. Nos. 82-3 ¶¶ 1, 21, 26; 85 ¶ 81).  The subcontract emphasizes that "[t]ime is of the essence" and requires WPEC to substantially complete work at the five locations by February 28, 2017, specifically consisting of furnishing and installing underground conduit and barrel vaults together with constructing underground infrastructure for the installation of the telecommunications.  (Doc. No. 82-3 ¶¶ 1, 21, 29; 92 (WPEC's Statement of Additional Undisputed Material Facts) ¶ 186.)  At the same time, the subcontract also provided for the possibility of revision and update to the completion deadline.  (Doc. No. 85 ¶¶ 80, 159.)

In addition, in a provision that is critical to the parties' dispute in this case, the prime contract *prohibits* DFJV from starting construction on the CP 2-3 project unless *all* the rights of way ("ROWs") necessary for the project have been acquired.  (Doc. No. 82-1, Fegan Decl., Ex. A (Prime Contract) ¶ 3.2(d).)  CHSRA was responsible for acquiring all the ROWs—either by purchasing them from property owners or through eminent domain proceedings—to the five locations so WPEC could begin its work.  (Doc. Nos. 82-3 ¶ 20; 85 ¶ 79.)  CHSRA shared the status of the ROW acquisition with DFJV through periodic reports.  (Doc. Nos. 82-3 ¶ 25; 85 ¶ 106.)  CHSRA had all the ROWs for the Peach Avenue, Cairo Avenue, 9th Avenue, and Clovis Avenue locations, but *never* acquired the ROWs for the Elkhorn Avenue location.  (Doc. No. 85 ¶¶ 82, 87–88.)  Notwithstanding the failure to acquire those ROWs, as early as October 2016, CHSRA permitted DFJV to begin work at the Elkhorn Avenue location *before* all ROWs at that

/////

/////

---

[7]  "Under California law, parties may validly incorporate by reference into their contract the terms of another document."  *Baker v. Aubry*, 216 Cal. App. 3d 1259, 1264 (1989).  The parties agree that the general provisions of the prime contract were incorporated into the subcontract.  (Doc. No. 85, WPEC's RUMF ¶ 178.)

1   location had been acquired.[8]  (*Id.* ¶¶ 111–12.)  DFJV never informed WPEC about the early work

2   permit granted by CHSRA or that the ROW prerequisite had been waived.[9]  (Doc. Nos. 85 ¶¶

3   111–12; 92 ¶ 190.)

4        Thus, WPEC began its subcontract work under the assumption that all necessary ROWs

5   had been acquired.  (Doc. Nos. 85 ¶¶ 82–87; 92 ¶¶ 190–91.)  But, as indicated above, CHSRA

6   failed to acquire all the necessary ROWs for the Elkhorn Avenue location; the other locations—

7   Peach Avenue, Cairo Avenue, 9th Avenue, and Clovis Avenue—"were underneath county owned

8   streets that were in existing county right-of-way and were *not* impacted by ROW delay."  (Doc.

9   No. 85 ¶¶ 82, 88) (emphasis added).  It is undisputed that WPEC could not start working on

10  parcels of land for which CHSRA had no ROWs, and because there was a delay acquiring ROW

11  related to at least some portions of the Elkhorn Avenue location, WPEC ultimately failed to

12  substantially complete all its work by February 28, 2017 as required by the subcontract.  (*Id.*

13  ¶¶ 82–88, 111–12.)  In the end, WPEC substantially completed work on the Peach Avenue

14  location by January 25, 2017, the Cairo Avenue location by February 24, 2017, and the 9th

15  Avenue location by August 1, 2017; but the work on the Clovis Avenue and Elkhorn Avenue

16  locations was *not* completed at the time DFJV terminated WPEC as a subcontractor in mid-March

17  2018.  (*Id.* ¶¶ 45, 83–87, 167.)

18       WPEC's fraudulent concealment claim is premised on DFJV's failure to communicate to

19  WPEC—prior to the execution of the subcontract—that CHSRA had not acquired all the

20  necessary ROWs, even though DFJV had no reasonable belief that WPEC could substantially

21

22  [8]  DFJV and CHSRA had an understanding that "[i]f the work ran into parcels that had not yet
    been acquired, the [DFJV] could stop and come back later to complete the work when those

23  parcels were acquired," and that "[a]ny extra costs associated with the remobilization and
    completion of work in these later acquired parcels would be charged to [CHSRA]."  (Doc. No. 85

24  ¶ 112) (alteration in original).  For example, there are nine parcels in the Elkhorn location for
    which CHSRA needed to acquire the ROWs.  (*Id.* ¶ 89.)  DFJV could start work on certain

25  parcels at the Elkhorn location in which CHSRA had the ROWs, then come back to work on the
    other parcels once CHSRA has the ROWs for those parcels.  (*See id.* ¶¶ 89, 112.)

26

27  [9]  DFJV maintained a process by which bidders could request information about the project
    before submitting their bids; nevertheless, WPEC did not request any information about the

28  schedule of the project or the status of the ROWs.  (Doc. No. 82-3 ¶¶ 30–33.)

1   complete all the work by February 28, 2017 without access to all the ROWs.  (Doc. No. 92

2   ¶¶ 190, 192–93.)  WPEC maintains that it would not have executed the subcontract had it known

3   of the concealed information and that DFJV knew this to be the case.  (Doc. Nos. 85 ¶ 10; 92

4   ¶¶ 185, 187.)  Approximately half of all issues presented in DFJV's motion for summary

5   judgment are related to WPEC's fraudulent concealment claim and the remedies sought with

6   respect to that claim.  (*See* Doc. No. 82-1 at 30–42.)

7   **B.      The Parties' Contractor's Licenses**

8          The other half of the issues presented by the pending motion turn on the California

9   Contractors' State License Law ("CSLL"), codified in California Business & Professions Code §

10  7000 *et seq.*  (*Id.* at 18–30.)  As relevant here, the CSLL requires that a contractor[10] must be "duly

11  licensed . . . at *all times* during the performance of that act or contract."  Cal. Bus. & Prof. Code §

12  7031 (emphasis added); *see also MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works*

13  *Co.*, 36 Cal. 4th 412, 428 (2005) ("The words 'at all times' convey the Legislature's obvious

14  intent to impose a stiff all-or-nothing penalty for unlicensed work . . . .").  The type of license a

15  contractor is required to maintain depends on the task the contractor is performing under the

16  contract.  *See Phoenix Mech. Pipeline, Inc. v. Space Expl. Techs. Corp.*, 12 Cal. App. 5th 842,

17  852 (2017).  There are three kinds of contractor's license:  (1) general engineering contractor

18  holding a class "A" license; (2) general building contractor holding a class "B" license; and (3)

19  specialty contractor holding a class "C" license.  *See* Cal. Bus. & Prof. Code § 7055; Cal. Code

20  Regs. tit. 16, §§ 830(a), 832, 834.

21         A corporation, like WPEC or DFJV, "qualifies for a contractor's license by the

22  appearance of a responsible managing officer or responsible managing employee who is qualified

23  for the same license classification as the classification being applied for."  *Jeff Tracy, Inc. v. City*

24

25  ---
    [10]  In California, a "contractor" is "a person or entity who (1) actually performs construction services; (2) 'supervise[s] the performance of construction services'; or (3) agrees by contract to
26  be 'solely responsible' for construction services.  In the last two scenarios, a license is required even if the construction work is actually performed by someone else."  *Siry Inv., L.P. v.*
27  *Farkhondehpour*, 45 Cal. App. 5th 1098, 1139–40 (2020).  The use of the term, "contractor," under the CSLL includes a "subcontractor."  Cal. Bus. & Prof. Code § 7026.  Accordingly, when
28  reading the CSLL, the term "contractor" connotes both DFJV and WPEC.

1    *of Pico Rivera*, 240 Cal. App. 4th 510, 518–19 (2015) (emphasis added) (citing Cal. Bus. & Prof.

2    Code §§ 7065, 7068); (*see also* Doc. No. 82-3 ¶¶ 6, 40).  In moving for summary judgment DFJV

3    cites no evidence to show what license its responsible managing officer or employee possessed at

4    all relevant times during the course of the subcontract.  (Doc. No. 98 at 2–3.)  The parties

5    disagree over whether the CSLL requires DFJV to maintain a contractor's license as prerequisite

6    for bringing the instant motion for summary judgment and cross-complaint for disgorgement.

7    (*See* Doc. Nos. 86 at 10; 98 at 2.)  By contrast, WPEC has submitted evidence to show that its

8    responsible managing officers ("RMOs") were Lazaro Lee Villa ("Mr. Villa"), who is also its

9    chief financial officer, holding class A, B, and C-46 licenses, and Virginia Ann Villa ("Ms.

10   Villa"), its president, holding only a class C-10 license.[11]  (Doc. Nos. 82-3 ¶¶ 5, 7, 23, 36; 89

11   (Lazaro Villa Decl.) ¶ 1.)  However, the parties dispute whether WPEC's class A and C-10

12   licenses were valid under the CSLL.  (*See* Doc. Nos. 82-1 at 19–20, 26–30; 86 at 11–16; 98 at 2–

13   3.)

14           Shortly before executing the subcontract, Ms. Villa informed WPEC's licensing servicer,

15   Capitol Services, Inc. ("CSI"), that WPEC intended to take Mr. Villa "off the license completely"

16   because Mr. Villa planned to start a new company.  (Doc. No. 85 ¶ 114.)  In its "Application for

17   Replacing the Qualifying Individual" filed with the California Contractors' State License Board

18   ("CSLB"),[12] WPEC requested that Mr. Lee be removed as an RMO and be replaced with Sarah

19   Villa, his daughter.  (Doc. Nos. 82-3 ¶ 8; 85 ¶ 115.)  CSI twice warned WPEC that if Mr. Villa

20   was not replaced within 90 days from the date of his disassociation, WPEC would lose its class A

21   license.  (Doc. Nos. 82-3 ¶ 9; 85 ¶ 117.)  In the end, Mr. Villa was removed as WPEC's RMO,

22   and, as a result, WPEC was without a class A license between February 22, 2017 and June 2,

23   /////

24   /////

25

26   [11]  Mr. Villa and Ms. Villa are husband and wife.  (Doc. Nos. 85 ¶ 115; 89, L. Villa Decl. ¶ 4.)

27   [12]  By law, the CSLB is an administrative body whose functions are to license, regulate, and
     discipline contractors doing business in California with the aim of protecting the public.  *See* Cal.

28   Bus. & Prof. Code §§ 7000.6, 7008; (*see also* Doc. No. 82-3 ¶¶ 2–4, 39.)

1    2017, while still engaging in the subcontract work.[13]  (Doc. Nos. 82-3 ¶¶ 7, 13; 85 ¶¶ 83–87.)

2    Despite this, there is no dispute that WPEC possessed its class C-10 license at all times while

3    engaging in the subcontract work.  (Doc. No. 92 ¶ 196.)  The parties instead dispute over whether

4    WPEC substantially maintained its class A license, notwithstanding the gap period between

5    February and June 2017, and whether WPEC's class C-10 license was sufficient to satisfy the

6    licensing requirements of the CSLL.  (*See* Doc. Nos. 82-1 at 19–20, 26–30; 85 ¶¶ 49, 52, 61; 86

7    at 11–16.)

8                                        **LEGAL STANDARD**

9            Summary judgment is appropriate when the moving party has shown "that there is no

10   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11   Fed. R. Civ. P. 56(a).  The "purpose of summary judgment is to 'pierce the pleadings and to

12   assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec.*

13   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  In summary

14   judgment practice, the moving party "initially bears the burden of proving the absence of a

15   genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

16   (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish

---

17   [13]  While DFJV argues that WPEC lost its class A license as early as December 30, 2016, WPEC
18   argues it was licensed until February 22, 2017.  (Doc. Nos. 82-1 at 20–21; 86 at 14.)  The court
     finds that DFJV has failed to create a genuine dispute of fact as to this issue.  *See S. Cal. Darts*
19   *Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014) ("A dispute is 'genuine' if 'a reasonable jury
     could return a verdict for the nonmoving party.'"  (citation omitted)).  The CSLB recorded WPEC
20   as having a class A license until February 22, 2017, (Doc. No. 93-3, Ex. N at 10), and DFJV's
     argument otherwise is unpersuasive.  Under California Business & Professions Code § 7068.2(a),
21   Mr. Villa must be removed as WPEC's RMO "90 days after the date of [his] disassociation" if
     there is no replacement.  Cal. Bus. & Prof. Code § 7068.2(a) (alteration in original).  Based on
22   this, DFJV argues because WPEC disassociated Mr. Villa as its RMO on October 1, 2016, WPEC
     lost Mr. Villa's class A license on December 30, 2016, or 90 days later, since there was no
23   replacement.  (Doc. No. 82-1 at 15, 23–24.)  But Section 7068.2(e)(1)(C) also authorizes the
     CSLB to extend the initial 90-day deadline specified in Section 7068.2(a) for up to another 90-
24   day if certain requirements are met.  *See* Cal. Bus. & Prof. Code § 7068.2(e)(1)(C); (*see also* Doc.
     No. 86 at 14).  The CSLB's record shows that the CSLB made an error in handling the
25   disassociation of Mr. Villa from WPEC and thus extended the validity of WPEC's class A license
26   until February 22, 2017, as permitted under Section 7068.2(e)(1)(C).  (Doc. Nos. 82-2, Ex. B at
     187–88; 85 ¶ 121; 93-3, Ex. N at 10.)  Accordingly, the court finds that there is no genuine
27   dispute of material fact that WPEC had its class A license until February 22, 2017 as the CSLB so
     deemed.
28

this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). "This burden is not a light one." *In re Oracle*, 627 F.3d at 387. Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

"Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citations omitted); *see also Matsushita*, 475 U.S. at 586-87 (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."). "To survive a motion for summary judgment, a nonmoving party must present 'evidence from which a reasonable jury could return a verdict in its favor.'" *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 854 (9th Cir. 2019) (citations omitted). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citation omitted). "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 628–29 (9th Cir. 2018) (citation omitted).

Material facts "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to

9

1    determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)

2    (citation omitted).

3                                         **ANALYSIS**

4          The legal issues presented for decision here can be grouped into two categories.  The first

5    category centers around whether the parties were duly licensed under the CSLL.  DFJV contends

6    that WPEC was *not* duly licensed, as required by the CSLL, during the performance of the

7    subcontract and is thus barred from maintaining this action.  (Doc. No. 82-1 at 19–20.)  WPEC

8    counters that DFJV was also required by the CSLL to maintain a contractor's license during the

9    performance of the subcontract, without which DFJV has no legal right to bring the instant

10   motion and the cross-complaint under the statute.  (Doc. No. 86 at 9–10.)  The second category of

11   issues turns on whether there is a genuine dispute that DFJV fraudulently induced WPEC into

12   executing the subcontract and, if so, what remedies WPEC is entitled to.  (*Id.* at 30–43.)  Before

13   turning to the merits of these issue, the court will first address the parties' requests for judicial

14   notice and evidentiary objections.

15   **A.     The Parties' Requests for Judicial Notice**

16          DFJV asks the court to take judicial notice of WPEC's licensing records, DFJV's request

17   for record from the California Division of Labor Standards Enforcement and the response thereto,

18   and public land records available on a Fresno County's website.  (Doc. No. 82-2 ¶¶ 1–5.)  WPEC

19   also asks the court to take judicial notice of the court records in this case and various California

20   statutes.  (Doc. No. 90 ¶¶ 1–17.)  Federal Rule of Evidence 201(b) permits a court to take judicial

21   notice of a *fact* not subject to reasonable dispute where it "(1) is generally known within the trial

22   court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

23   accuracy cannot reasonably be questioned."[14]  Fed. R. Evid. 201(b).  Accordingly, the court takes

24   judicial notice of the existence of the requested documents, but *not* as to the parties'

---

25   [14] Rule 201 "governs judicial notice of an adjudicative fact *only*, not a legislative fact" or law.

26   Fed. R. Evid. 201(a) (emphasis added).  WPEC's request for judicial notice of California statutes
     is improper and unnecessary under Rule 201.  (*See* Doc. No. 90 ¶¶ 7–17.)  The court must always

27   apply relevant state law.  *See Glendale Assocs., Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1154 (9th Cir.
     2003) ("In analyzing questions of state law, we are bound by the decisions of the state's highest

28   court." (citation omitted)).

interpretations of those documents or to truth of the matters stated therein to the extent they are reasonably disputed.  *See Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 657 (S.D. Cal. 2018) ("'While matters of public record are proper subjects of judicial notice, a court may take notice only of the authenticity and existence of a particular [record], not the veracity or validity of its contents.'"  (citations omitted)); *California Sportfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017) ("Courts cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed, as they are here for certain exhibits."  (citations omitted)); *United States v. S. California Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("A court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted.").

## B.     The Parties' Objections

Both parties have objected to the evidence presented by the other side on summary judgment, but neither party has responded to its opponent's objections.  (*See* Doc. Nos. 91, 99.) "A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  Thus, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  The party seeking admission of evidence "bears the burden of proof of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  Courts, however, "do not focus on the admissibility of the evidence's form" at summary judgment stage; rather, the court is to "focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also C.C. v. Paradise High Sch.*, No. 2:16-CV-02210 KJM DMC, 2019 WL 6130439, at *1 (E.D. Cal. Nov. 19, 2019) ("A court may evaluate evidence in an inadmissible form if the evidentiary objections could be cured at trial.").

Both parties' objections to each other's evidence rest heavily on irrelevancy and improper legal conclusion, (*see* Doc. Nos. 91, 99), even though it has been recognized that "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard

1    itself." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *see also*

2    *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126

3    n.1 (E.D. Cal. 2008) (holding that objections on grounds that the evidence is conclusory,

4    argumentative, irrelevant "need not be ruled on").  Having reviewed the parties' objections, the

5    court finds that they are almost entirely "boilerplate recitations of evidentiary principles or

6    blanket objections without analysis applied to specific items of evidence." *Stonefire Grill, Inc. v.*

7    *FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (quoting *Doe v. Starbucks, Inc.*,

8    No. 08–0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)).  The court therefore need "not

9    scrutinize each objection and give a full analysis of identical objections raised as to each fact."

10   *Id.*  All of the parties' boilerplate and blanket objections are overruled.

11   **C.      Whether the Parties Were Properly Licensed Under the CSLL**

12            The court now turns to the merits of DFJV's motion for summary judgment, starting with

13   the licensing issues under the CSLL.  "The CSLL provides a comprehensive scheme which

14   governs contractors doing business in California." *Judicial Council of California v. Jacobs*

15   *Facilities, Inc.*, 239 Cal. App. 4th 882, 894 (2015) ("*JCC*") (quoting *Asdourian v. Araj*, 38 Cal.

16   3d 276, 282 (1985)).  Its purpose is to protect "the public from incompetent or dishonest

17   providers of building and construction services." *Pac. Caisson & Shoring, Inc. v. Bernards Bros.*

18   *Inc.*, 198 Cal. App. 4th 681, 687 (2011) ("*Pac. Caisson I*") (citations omitted).  The CSLL

19   operates in large part through subdivisions (a) and (b) of California Business & Professions Code

20   § 7031, which are designed "to discourage persons who have failed to comply with the licensing

21   law from offering or providing their unlicensed services for pay." *JCC*, 239 Cal. App. 4th at 895

22   (citation omitted).  Subdivision (a)—also known as the "shield" of the CSLL, *Loranger v. Jones*,

23   184 Cal. App. 4th 847, 854 (2010)—"operates to deny access to the courts to contractors who

24   were not licensed at all times during their performance." *Womack v. Lovell*, 237 Cal. App. 4th

25   772, 780 (2015).  Subdivision (b), complimentarily known as the "sword" of the CSLL,

26   "authorizes a person who utilizes the services of an unlicensed contractor to bring an action to

27   recover all compensation paid to the contractor for his/her work." *Loranger*, 184 Cal. App. 4th at

28   854.  At issue here are these two subdivisions of § 7031.

12

1    Relying on § 7031(a), DFJV moves for a summary judgment on the entirety of WPC's

2    complaint, arguing that the CSLL bars WPEC from recovering on the subcontract because it

3    failed to maintain a valid contractor's license during the entire performance of the subcontract.

4    (Doc. No. 82 at 2.)  In addition, DFJV seeks judgment in its favor on its cross-claim against

5    WPEC for disgorgement under § 7031(b).  (*Id.*)  WPEC opposes the pending motion for summary

6    judgment, contending that DJFV, which has not shown that it was a duly licensed contractor

7    under the CSLL either, is barred by § 7031(a) from defending itself against WPEC's claims and

8    even from bringing the cross-claim.  (Doc. No. 86 at 10.)  WPEC further disputes DFJV's

9    contention that it was *not* a duly licensed contractor during the performance of the subcontract.

10   (*Id.* at 11–17.)

11   For reasons explained below, the court concludes that:  (1) as a matter of law, DFJV need

12   not satisfy the licensing requirements of § 7031(a) in order to *defend* itself against WPEC's

13   complaint; (2) there is a genuine dispute of material fact as to whether WPEC was duly licensed

14   during its performance of the subcontract; and (3) DFJV has failed to meet its burden of

15   establishing that it may bring its cross-claim for disgorgement *without* first demonstrating that it

16   was a duly licensed contractor during the performance of the subcontract.  It follows that DFJV's

17   motion for summary judgment as to the entire complaint and cross-complaint must be denied.

18       1.   <u>Whether DFJV Must be Duly Licensed Under Section 7031(a) to Defend Itself</u>

19   The court first turns to the preliminary issue raised by WPEC:  whether DFJV is

20   prohibited by § 7031(a) from bringing the instant motion for summary judgment.  (Doc. No. 86 at

21   10.)  According to WPEC's reading, § 7031(a) precludes DFJV "from the *relief* sought in this

22   motion" because DFJV has never claimed—in its answer, cross-complaint, or summary judgment

23   motion—that it was a duly licensed contractor during the entire course of the subcontract.  (*Id.*)

24   (emphasis added).  In essence, WPEC wants to the court to decide this issue regarding the proper

25   construction of § 7031(a) before reaching the merits of DFJV's motion for summary judgment.

26   Before delving into the analysis of § 7031(a), it is necessary to separate the issues raised

27   because WPEC appears to have conflated them.  DFJV is seeking two distinct avenues of "relief"

28   by way of this pending motion for summary judgment.  First, DFJV seeks summary judgment in

13

1    its favor based upon its affirmative defense that WPEC lacked an appropriate contractor's license

2    during the performance of the subcontract, as required by § 7031(a).  Second, DFJV brings a

3    cross-complaint under § 7031(b), seeking to disgorge payments made to WPEC pursuant to the

4    subcontract.  (Doc. No. 82 at 2.)  While the first issue deals with whether DFJV is required to be

5    duly licensed to *defend itself against WPEC's complaint*, the second deals with whether such a

6    license is required for DFJV to *bring its cross-claim*.  These are distinct issues that must be

7    addressed separately.  The court will address the second issue later in Section C.3 of this order.

8         As to the first issue, and as with any statutory construction issue, the court must begin by

9    examining "the statutory language and give it a plain and commonsense meaning."  *People v.*

10   *Ellis*, 31 Cal. App. 5th 1090 (2019) (citation omitted); *accord United States v. Williams*, 659 F.3d

11   1223, 1225 (9th Cir. 2011) ("In statutory construction, our starting point is the plain language of

12   the statute.").  Section 7031(a) states in pertinent part:

13
> [N]o person engaged in the business or acting in the capacity of a
> contractor, may *bring* or *maintain* any action, or *recover* in law or

14
> equity in any action, in any court of this state for the collection of
> compensation for the performance of any act or contract where a

15
> license is required by this chapter without alleging that he or she was
> a duly licensed contractor at all times during the performance of that

16
> act or contract regardless of the merits of the cause of action brought
> by the person . . . .

17

18   Cal. Bus. & Prof. Code § 7031(a) (emphasis added).  WPEC essentially reads § 7031(a)'s

19   requirement that only a licensed contractor may "bring or maintain any action, or recover in law

20   or equity in any action" to encompass a defendant defending itself in a legal action.[15]  (Doc. No.

21   86 at 10.)  In this regard, WPEC's reading relies exclusively on the decision in *Ahdout v.*

22   *Hekmatjah*, 213 Cal. App. 4th 21 (2013).  (*See id.*)  *Ahdout*, however, does not stand for the

23   proposition that a contractor must be duly licensed under § 7031(a) in order to defend itself in a

24   suit since that issue was not even before the court in that case.[16]  *See Ahdout*, 213 Cal. App. 4th at

25   ――――――――――――――――
     [15]  This issue could have been easily resolved had DFJV submitted evidence of its valid

26   contractor's license, but it has not done so.  (*See* Doc. No. 98 at 2.)

27   [16]  At issue in *Ahdout* was "whether the trial court properly deferred to the arbitrators'
     determination that respondents did not perform unlicensed contracting work on the Project, such

28   that section 7031, subdivision (b) is inapplicable."  *Ahdout*, 213 Cal. App. 4th at 32.

                                    14

21, 32; *see also Cal. Bldg. Indus. Ass'n v. State Water Res. Control Bd.* (2018) 4 Cal. 5th 1032, 1043 ("It is axiomatic that cases are not authority for propositions that are not considered." (citation omitted)).  Rather, in *Ahdout* the court merely stated in passing that § 7031(a) "*shields* parties who utilize the services of an unlicensed contractor *from* lawsuits by that contractor seeking to collect payment for unlicensed work."  *Ahdout*, 213 Cal. App. 4th at 30 (emphasis added) (citations omitted).  Far from supporting DFJV's argument here, *Ahdout* suggests that DFJV may "shield" or defend itself against suits brought by an unlicensed contractor, such as WPEC.

The California Supreme Court has not addressed the interpretation of § 7031(a) as advanced by WPEC.  *See Glendale Assocs., Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1154 (9th Cir. 2003) ("In analyzing questions of state law, we are bound by the decisions of the state's highest court.").  "In the absence of a controlling California Supreme Court decision, we must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids."  *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003) (citations omitted).  The California Court of Appeal's decision in *Domach v. Spencer*, 101 Cal. App. 3d 308 (1980) and California rules of statutory construction provide guidance here.  For the reasons set forth below, these interpretative aids demonstrate that WPEC's reading of § 7031(a) as requiring a defendant to be a duly licensed contractor to defend itself in a suit to be without merit.

In *Domach*, the defendant—an unlicensed contractor—argued that because he was unlicensed, § 7031(a) shielded him from suits from the plaintiffs, the property owners who hired the defendant to build their home.  *See Domach*, 101 Cal. App. 3d at 310–11.  On appeal, the court rejected the defendant's argument and reasoned that § 7031(a) barred an unlicensed contractor from bringing a suit, but "it [did] not shield such a person from a suit arising out of such a contract."  *Id.* (alteration in original).  Although not directly on point with respect to the issue posed hereto, the decision in *Domach* supports the proposition that § 7031(a) does not apply to shield an unlicensed defendant from suit.

/////

15

1     More compelling, though, is the plain language of § 7031(a).  Under California law, "[t]he

2 plain meaning controls if there is no ambiguity in the statutory language."  *Poole v. Orange Cty.*

3 *Fire Auth.*, 61 Cal. 4th 1378, 1385 (2015).  Here, the plain language of § 7031(a) is unambiguous.

4 The statute specifies that no person may "bring" or "maintain" an action, or "recover" in any

5 action; there is no reference to "defend" in an action.  Cal. Bus. & Prof. Code § 7031(a); *see also*

6 *Alex R. v. Superior Court* (2016) 248 Cal. App. 4th 1, 9 ("It is a 'cardinal rule of statutory

7 construction' that court must not 'insert what has been omitted' from a statute."  (citations

8 omitted)).  The ordinary meaning of "to defend" is entirely different than "to bring," "maintain,"

9 or "recover" in an action.  *See Bonnell v. Med. Bd.*, 31 Cal. 4th 1255, 1261 (2003) ("[W]e

10 presume the Legislature meant what it said and the plain meaning of the statute governs.").

11 *Compare* Bring an Action, Maintain, Recover Definitions, Black's Law Dictionary (11th ed.

12 2019), *available at* Westlaw (defining to "bring" an action as "[t]o sue"; to "maintain" as "to

13 continue"; to "recover" as "[t]o obtain (relief) by judgment or other legal process") *with* Defend

14 Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw (defining to "defend"

15 as "[t]o deny, contest, or oppose (an allegation or claim)").  Based on the plain reading and

16 unambiguous language of § 7031(a), § 7031(a) does not apply to a defendant in a suit.  *See MCI*

17 *Communications Services, Inc. v. California Dept. of Tax & Fee Administration* (2018) 28

18 Cal.App.5th 635, 643 ("'The statute's words generally provide the most reliable indicator of

19 legislative intent; if they are clear and unambiguous, '[t]here is no need for judicial construction

20 and a court may not indulge in it.'"  (citation omitted)).

21     Accordingly, DFJV may defend itself by seeking summary judgment in its favor as to the

22 claims asserted in WPEC's complaint without proving that it was a duly licensed contractor under

23 § 7031(a).  The court will therefore consider DFJV's motion for summary judgment on its merits.

          2.  Whether WPEC was Duly Licensed as Required by Section 7031(a)

25     Under § 7031(a), if WPEC was "unlicensed for any period of time while delivering

26 construction services," it "forfeits all compensation for the work, not merely compensation for the

27 period when [it] was unlicensed."  *JCC,* 239 Cal. App. 4th at 896 (alteration in original) (citation

28 omitted).  This is known as "forfeiture."  *Id.* at 894.  "[A]n unlicensed contractor is subject to

1   forfeiture even if the other contracting party was aware of the contractor's lack of a license, and

2   the other party's bad faith or unjust enrichment cannot be asserted by the contractor as a defense

3   to forfeiture." *Id.* at 897.   Section 7031(a) represents the California "legislative determination

4   that the importance of deterring unlicensed persons from engaging in the contracting business

5   outweighs any harshness between the parties, and that such deterrence can best be realized by

6   denying violators the right to maintain any action for compensation in the courts of this state."

7   *Hydrotech*, 52 Cal. 3d at 995.   "If proper licensure 'is controverted,' then the contractor *must*

8   prove licensure by producing a verified certificate of licensure from the Board establishing that

9   the contractor bringing the action was duly licensed in the proper classification at all times during

10   the performance of any relevant contract."   *Pac. Caisson I*, 198 Cal. App. 4th at 688 (emphasis

11   added) (citing Cal. Bus. & Prof. Code § 7031(d)).

12        DFJV argues that because WPEC was not duly licensed at all times during the

13   performance of the subcontract, as required by § 7031(a), WPEC is barred from bringing this

14   action.  (Doc. No. 82-1 at 18–19.)  WPEC disputes that it was unlicensed.  (Doc. No. 86 at 11–

15   16.)  As noted above, relevant here are WPEC's class A and C-10 licenses.  (*See supra*

16   Background, Section B.)  There is no genuine dispute that WPEC did not possess its class A

17   license from February 22 to June 2, 2017, but WPEC indisputably had a class C-10 license at all

18   times during the performance of the subcontract.  (Doc. Nos. 82-3 ¶¶ 7, 13, 36; 92, WPEC's

19   AUMF ¶ 196.)  WPEC contends that it was a duly licensed class A or C-10 contractor at "all

20   times" during the performance of the subcontract as required by § 7031(a).  (Doc. No. 86 at 12.)

21   WPEC alternatively argues that even if it was not licensed at *all* times during the performance of

22   the subcontract, it nonetheless substantially complied with the licensing requirements.  (*Id.* at 16–

23   17.)  For the reasons that follow, the court finds that there is a genuine dispute as to whether

24   WPEC's class C-10 license adequately satisfies § 7031(a), but there is no genuine dispute that

25   WPEC did not possess a class A license at all times during the performance of the subcontract.

26   /////

27   /////

28   /////

| | |
|---|---|
| 1 | a. *Whether WPEC Was Licensed at All Times During the Performance of the* |
| 2 | *Subcontract* |

3      With respect to WPEC's class A license, there are two issues:  (1) whether WPEC had its

4   class A license at all relevant times, and if not, (2) whether WPEC substantially complied with

5   the licensing requirements.  As the moving party, DFJV bears the burden of establishing the first.

6   As the party asserting the substantial compliance exception, WPEC bears the burden as to the

7   second.

8                 i.       WPEC Did Not Possess a Class A License at All Times During the

9                        Performance of the Subcontract

10      The court first turns to the question of whether WPEC was "a duly licensed contractor at

11   all times during the performance of that act or contract" with regard to its class A license, Cal.

12   Bus. & Prof. Code § 7031(a), even though WPEC was without that license from February 22 to

13   June 2, 2017.  WPEC concedes that it began its preparatory work on the subcontract on

14   November 15, 2016, (Doc. No. 85, WPEC's RUMF ¶¶ 83–85), and did not demobilize until

15   September 8, 2017, (Doc. No. 89 (L. Villa Decl.) ¶¶ 34, 38–41).  Nonetheless, WPEC argues that

16   § 7031(a) only required it to possess its class A license until the "reasonably expected completion

17   date" of the subcontract, which was February 12, 2017 or 90 days after the execution of the

18   subcontract.  (Doc. No. 86 at 14.)  According to WPEC, the subcontract specifies that this is the

19   date WPEC was required to "substantially complete" its performance.[17]  (*Id.*)  WPEC provides no

20   authority for this "reasonably expected completion date" standard, which is not grounded in the

21   text of § 7031(a).  (*See id.*)

22      In effect, WPEC is construing "at all times during the performance of that act or contract"

23   under § 7031(a) to mean "until the parties reasonably expected to complete the contract work."

24   This counterintuitive construction of § 7031(a) is contrary to the plain meaning of the words of

25

---

26   [17]  Notably, the evidence cited by WPEC does not establish that the subcontract mandated WPEC to substantially complete all its work by February 12, 2016.  (Doc. Nos. 86 at 14 n. 3; 92 ¶¶ 186–

27   87; *but see* Doc. Nos. 82-3 ¶ 29 (WPEC conceding that the subcontract calls for the work to be substantially completed by February 28, 2017); 85 ¶ 110 (same)).  The court nonetheless accepts

28   the February 12, 2016 date *arguendo* for purposes of the analysis in this subsection.

1   the statute and the court will not adopt it.  *See Kurtin v. Elieff*, 215 Cal. App. 4th 455, 471–72

2   (2013) ("[C]ourts prefer a more natural reading of text to a less natural one, whether that text be

3   found in a statute"); *Holland*, 58 Cal. 4th at 490 ("If the plain, commonsense meaning of a

4   statute's words is unambiguous, the plain meaning controls."  (citation omitted)); *accord King v.*

5   *Burwell*, 576 U.S. 473, 486 (2015) ("If the statutory language is plain, we must enforce it

6   according to its terms.").  "The words 'at all times' convey the Legislature's obvious intent to

7   impose a stiff all-or-nothing penalty for unlicensed work by specifying that a contractor is barred

8   from all recovery for such an 'act or contract' if unlicensed at any time while performing it."  *MW*

9   *Erectors*, 36 Cal. 4th at 426.  Although this "stiff all-or-nothing penalty" reading may seem

10  unduly harsh, the California Supreme Court has stressed:

11
12              Section 7031 represents a legislative determination that the
              importance of deterring unlicensed persons from engaging in the
              contracting business outweighs any harshness between the parties,
13              and that such deterrence can best be realized by denying violators the
              right to maintain any action for compensation in the courts of this
14              state.

15  *Hydrotech*, 52 Cal. 3d at 995.

16              Furthermore, to read § 7031(a) as WPEC argues it should be read, would essentially

17  permit WPEC to work from February 13 to June 2, 2017 without a license.  (*See* Doc. No. 85

18  ¶¶ 83–87.)  This construction would undermine the purpose of the licensing requirements to

19  protect the public "against persons who are unqualified to perform the required work."  *WSS*

20  *Indus. Constr., Inc. v. Great W. Contractors, Inc.*, 162 Cal. App. 4th 581, 593 (2008) (quoting

21  *Currie v. Stolowitz*, 169 Cal. App. 2d 810, 814–815 (1959)); *see also Kaufman v. Diskeeper*

22  *Corp.* (2014) 229 Cal. App. 4th 1, 9 (courts must seek "'a reasonable and commonsense

23  interpretation consistent with its apparent purpose, practical rather than technical in nature, which

24  upon application will result in wise policy rather than mischief or absurdity.'"  (citation omitted)).

25  For these reasons, the court declines to adopt WPEC's reading of § 7031(a).  Because WPEC did

26  not possess its class A license between February 12 and June 2, 2017, the court finds that DFJV

27  has met its initial burden of showing that WPEC was not a duly licensed class A contractor "at all

28  times during the performance" of the subcontract as a matter of law.  Cal. Bus. & Prof. Code

1   § 7031(a); *see also MW Erectors*, 36 Cal. 4th at 428 (a contractor is unlicensed if its "licensure

2   lapsed at any time during the work").  The burden therefore shifts WPEC to establish a genuine

3   dispute as to whether it substantially complied with the licensing requirements.

4                                    ii.        Whether WPEC's Maintenance of Class A License was in

5                                               Substantial Compliance with § 7031(a)

6           In opposition to DFJV's motion for summary judgment, WPEC argues that even if it was

7   not licensed "at all times during the performance" of the subcontract, there is a genuine dispute of

8   material fact as to whether the substantial compliance exception of § 7031(e) applies.  (Doc. No.

9   86 at 14–16.)  "Section 7031, subdivision (e), provides the sole exception to the contractor's

10   licensure requirements" of subdivision (a).  *WSS*, 162 Cal. App. 4th at 588.  Under § 7031(e),

11   WPEC may avoid forfeiture by showing that it substantially complied with the licensure

12   requirements if it

13              (1) had been duly licensed as a contractor in this state prior to the
                performance of the act or contract, (2) acted reasonably and in good
14              faith to maintain proper licensure, and (3) acted promptly and in good
                faith to remedy the failure to comply with the licensure requirements
15              upon learning of the failure.

16   The substantial compliance doctrine applies only "if all three elements of subdivision (e) are

17   satisfied."  *WSS*, 162 Cal. App. 4th at 595 (citation omitted).  WPEC bears the burden of showing

18   a genuine dispute as to all three elements.  In applying § 7031(e), the court is mindful that this

19   "exception to the forfeiture rule is 'extremely narrow' and applies 'only where a contractor was

20   without a license owing to circumstances truly beyond his control.'"  *Pac. Caisson & Shoring,*

21   *Inc. v. Bernards Bros. Inc.*, 236 Cal. App. 4th 1246, 1257 (2015) ("*Pac. Caisson II*") (quoting

22   *Construction Financial v. Perlite Plastering Co.*, 53 Cal. App. 4th 170, 182 (1997)).  The court

23   need only address the second element of the exception, however, in finding that WPEC has failed

24   to meet its burden on summary judgment.

25           As noted above, the second element requires that WPEC "acted reasonably and in good

26   faith to maintain proper licensure," notwithstanding the fact that it was without a class A license

27   between February 22 to June 2, 2017, (Doc. No. 82-3 ¶ 13).  "The phrase 'acted reasonably and in

28   good faith to maintain proper licensure' pertains to conduct *prior* to suspension."  *Pac. Caisson*

1   *II*, 236 Cal. App. 4th at 1257 (emphasis added) (citation omitted).  The word "maintain" means to

2   "continue," to "hold or preserve," to "keep in existence or continuance," and to "keep in good

3   order."  *Id.* at 1257–58.  Under California law, reasonableness is, as a general matter, an

4   "objective" test that asks whether a "party's actions were fair, proper, and sensible in light of the

5   circumstances"—and *not* "a party's intentions or the motives."  *Saint Francis Mem'l Hosp. v.*

6   *State Dep't of Pub. Health*, 9 Cal. 5th 710, 729 (2020) (citation omitted).  "Good faith," on the

7   other hand, is "a test 'ordinarily used to describe that state of mind denoting honesty of purpose,

8   freedom from intention to defraud, and, generally speaking, being faithful to one's duty or

9   obligation.'"  *Id.* (brackets and citation omitted).

10          Here, even viewing the evidence in the light most favorable to WPEC, the court concludes

11   WPEC has failed to establish the existence of a genuine disputed issue of material fact as to the

12   second element of the substantial compliance exception.  *See Pac. Caisson II*, 236 Cal. App. 4th

13   at 1257 (holding that the substantial compliance exception is to be applied in "extremely

14   narrowed" circumstances).  WPEC concedes that shortly after the subcontract was executed, it

15   informed its license servicer, CSI, that it wanted its RMO Mr. Villa to be "off the license

16   completely" because he planned to start a new company.  (Doc. No. 85 ¶ 114.)  Thereafter, in

17   April 2016, WPEC submitted to the CSLB an application, requesting that its then-RMO Mr. Villa

18   be replaced with a new RMO, Ms. Villa.  (Doc. No. 82-2, Ex. B at 112–115; *see also* Doc. No. 88

19   (Virginia Villa Decl.) ¶ 5 (WPEC admitting that it also attempted in August 2016 to replace Mr.

20   Villa's licensing with a class B license of Sarah Balfanz).)  Thus, WPEC had in fact requested

21   that Mr. Villa's class A license be removed and replaced nearly 10 months before it was

22   ultimately removed in February 2017.  To compound this, WPEC was twice reminded by CSI that

23   WPEC would lose its class A license because of Mr. Villa's removal if there was no replacement

24   in place.  (Doc. No. 85 ¶ 117.)  Sometime in November 2016, Ms. Villa attempted to cancel the

25   request to remove Mr. Villa as WPEC's RMO, but was told by CSLB's staff that it "could not be

26   done."  (Doc. No. 88 (Virginia Villa Decl.) ¶ 8.)  WPEC presents no evidence of what effort it

27   undertook thereafter to find a replacement for Mr. Villa (e.g., hire someone with a class A license

28   to replace Mr. Villa) and to avert losing its class A license *prior* to February 22, 2017.  (Doc.

1   Nos. 82-4, Ex. 119 at 382:13–19; 88 ¶¶ 8–10).  Consequently, the CSLB removed WPEC's class

2   A license on February 22, 2017.  (Doc. No. 82-3 ¶ 13.)  Based on this evidence presented on

3   summary judgment, no reasonable juror could conclude that WPEC's inaction from November

4   2016 onward was a "fair, proper, and sensible" way to act to avoid losing its class A license, or

5   that WPEC was faithfully discharging its obligation to maintain its class A license *prior* to

6   February 22, 2017.[18]  *See, e.g.*, *Twenty-Nine Palms Enterprises Corp. v. Bardos*, 210 Cal. App.

7   4th 1435, 1438–39, 1453 (2012) (holding that the defendant was not acting reasonably and in

8   good faith because it waited until the last minute to apply for a contractor's license and was

9   without a proper license near the end of its contract work).  In other words, the loss of WPEC's

10  class A license in this case was *not* "truly beyond [its] control."  *Pac. Caisson II*, 236 Cal. App.

11  4th at 1257 (alteration in original).

12        In its opposition, WPEC explains that the CSLB made a mistake in processing its

13  disassociation, but that CSLB corrected the mistake by extending the validity of WPEC's class A

14  license from December 20, 2016 to February 22, 2017.  (*See* Doc. No. 86 at 15–16; *see also supra*

15  note 13.)  WPEC does not explain, however, how the CSLB's extension of time to February 22,

16  2017 prevented WPEC from acting reasonably and in good faith to maintain its class A license

17  *prior* to the suspension of it on February 22, 2017.  Rather, it seems CSLB's extension afforded

18  WPEC even additional time to find a replacement for Mr. Villa.  In any event, the court is not

19

20  [18]  WPEC submits that on May 22, 2017, Ms. Villa "checked the CSLB website and became
    aware, for the first time, that WPEC's A license had been removed."  (Doc. No. 88 ¶ 10.)  This,
21  however, is *immaterial* because the undisputed evidence on summary judgment establish that Ms.
    Villa knew its class A license would be suspended by December 20, 2016 if the RMO was not
22  timely replaced, and, indeed, WPEC sought to extend the time for replacement, which extension
    of time the CSLB granted until February 22, 2017.  A necessary inference to be drawn from this
23  evidence is that Ms. Villa knew when WPEC's class A license would be suspended, or at least
    should have known.  *See Hydrotech*, 52 Cal. 3d at 999 ("[I]f unlicensed contractors were not held
24  to knowledge of its requirements," "protective purposes of the licensing law would be
    nullified.").  Ms. Villa also states that after she learned about the suspension of WPEC's class A
25  license in May 2017, she submitted a request to re-add Mr. Villa's class A license as WPEC's
    RMO on May 24, 2017.  (Doc. No. 88 ¶¶ 9–12.)  This effort to reinstate WPEC's class A license
26  *after* the license was suspended is also *not material* to whether she acted "acted reasonably and in
27  good faith to maintain proper licensure . . . *prior* to [the] suspension" of the license.  *Pac.
    Caisson II*, 236 Cal. App. 4th at 1257 (emphasis added) (citation omitted).
28

1    persuaded that this fact is material to the second element of the substantial compliance exception,

2    even when the evidence on summary judgment is viewed in light most favorable to WPEC.

3        WPEC also relies on three additional decisions to no avail.  (Doc. No. 86 at 16.)  The first

4    case, *Slatkin v. White*, 102 Cal. App. 4th 963 (2002), bears no semblance to the present case.  At

5    issue on appeal in *Slatkin* was whether the denial of a motion for preliminary injunction should be

6    affirmed and the state appellate court made expressly clear that the substantial compliance

7    doctrine was not an issue before the court.  *See Slatkin*, 102 Cal. App. 4th at 969, 972.  The

8    second case cited by WPEC, *Pacific Caisson I*, 198 Cal. App. 4th 681, fares no better.  There the

9    appellate state court simply instructed the trial court to consider substantial compliance on

10   remand because "the trial court never reached the doctrine of substantial compliance."  *Pac.*

11   *Caisson I*, 198 Cal. App. 4th at 696.  Both *Slatkin* and *Pacific Caisson I* are therefore inapposite.

12   Even less persuasive is the third decision relied upon by WPEC, *Pacific Custom Pools, Inc. v.*

13   *Turner Construction Co.*, 79 Cal. App. 4th 1254, 1264 (2000).  Indeed, a fair reading of that

14   decision reveals that it supports the conclusion reached by the court here.  In *Pacific Custom*

15   *Pools, Inc.*, the state appellate court found that the subcontractor "had notice of the suspension"

16   of its license, but nonetheless "failed to timely renew the license" and sent a check to cover the

17   license renewal that was later dishonored.  *Pac. Custom*, 79 Cal. App. 4th at 1265.  Based on

18   these facts, the California Court of Appeal held that the subcontractor was acting unreasonably, in

19   bad faith, and was therefore not in substantial compliance.  *Id.*  The evidence before the court on

20   summary judgment can support only the same conclusion here.

21       By failing to establish the existence of a genuine dispute of an issue of material fact as to

22   the second element of substantial compliance, WPEC has failed to meet its burden in opposition

23   to summary judgment on this issue.  The court therefore concludes that WPEC was not a duly

24   licensed subcontractor with respect to its class A license at *all* times during the performance of

25   the subcontract.

26           b.     *Whether WPEC's Class C-10 License is Valid Under § 7031(a)*

27       Even though the court has concluded that WPEC did not have a class A license at all times

28   during the performance of the subcontract, it is still undisputed that WPEC had its class C-10

1   license at all relevant times through its RMO Ms. Villa.  (Doc. No. 92 ¶ 196.)  DFJV argues,

2   however, that holding a class C-10 license does not make WPEC a duly licensed subcontractor

3   within the meaning of § 7031(a).  (Doc. Nos. 82-1 at 26–30; 85 ¶ 52.)  WPEC disputes this.

4   (Doc. No. 86 at 12–13.)  As the moving party, DFJV bears the initial burden of precluding any

5   genuine dispute of material fact that WPEC was an unlicensed subcontractor under § 7031(a)

6   even though WPEC held a class C-10 license.  For the reasons explained below, the court

7   concludes that DFJV has failed to meet its burden in this regard.

8       As before, the court begins the analysis by focusing on the plain language of § 7031(a).

9   *See Conservatorship of Whitley*, 50 Cal. 4th 1206, 1214 (2010) ("We begin with the statutory

10  language because it is generally the most reliable indication of legislative intent.").  Under that

11  provision, WPEC may not bring this action "for the collection of compensation for the

12  performance of any act or contract *where a license is required by this chapter* without alleging

13  that he or she was a duly licensed contractor at all times during the performance of that act or

14  contract."  Cal. Bus. & Prof. Code § 7031(a) (emphasis added).  In moving for summary

15  judgment in its favor, DFJV appears to construe "where a license is required by this chapter" to

16  mean whatever the license that is specified in the subcontract; in other words, the terms of the

17  contract dictates the license required.  (Doc. No. 82-1 at 26.)  According to DFJV, the "plans and

18  specifications" in the bid documents, which is incorporated into the subcontract, required WPEC

19  to hold a class A license.[19]  (Doc. Nos. 82-4 ¶ 49; 85 ¶ 52; *see also* Doc. Nos. 82-1, Ex. O at 134;

20  93-2, Ex. J (Subcontract), Attach. C at 68.)  Based on the contract terms, DFJV argues that

21  holding a class C-10 license does not make WPEC a duly licensed subcontractor within the

22  meaning of § 7031(a).[20]  (Doc. No. 82-1 at 26–30.)

23

---

24  [19]  As WPEC correctly points out, however, DFJV's invitation to bid (*see* Doc. No. 82-1, Ex. Q at
25  134) is not incorporated by reference into the subcontract.  (Doc. No. 85 ¶¶ 49, 51, 69, 129; *see*
    Doc. No. 93-2, Ex. J (Subcontract), Attach. C at 68–69 (listing documents that are incorporated
26  by reference to the exclusion of DFJV's invitation to bid).)

27  [20]  The court acknowledges that under contract law DFJV may enforce the licensing requirement
    against WPEC if such requirement is part of the subcontract.  But DFJV is not asking the court to
28  consider WPEC's breach-of-contract claim here.

1    DFJV relies on the decision in *Jeff Tracy*, 240 Cal. App. 4th 510, to support its position.

2    (Doc. Nos. 82-1 at 26; 98 at 3.)  In that case a city sued a general contractor for disgorgement,

3    claiming that the general contractor was not duly licensed under § 7031(a).  *Jeff Tracy*, 240 Cal.

4    App. 4th at 519–20.  The contract and the bid document between the parties required the general

5    contractor to possess a class A license, but on appeal, the general contractor argued that it "could

6    have properly performed [the contract work] using only its C-27 landscaping license."  *Id.* at 513,

7    515 (alteration in original).  The California Court of Appeal rejected that argument and held:

8    
9    > [S]ection 7031, subdivision (a) provides that a contractor must allege
>    that "he or she was a duly licensed contractor at all times during the
>    performance of that act or contract."  And section 7031, subdivision
10   > (d) provides that the contractor must prove that it "was duly licensed
>    in the proper classification of contractors at all times during the
>    performance of any act or contract covered by the action."  Here, [the
11   > general contractor] was performing under a *public works contract*
>    that *specifically required* the general contractor to have a valid class
12   > A license at all times during the Project.  We therefore hold that when
>    a contractor does not have the specific license specified in the
13   > contract under which the work is performed, the contractor is
>    "unlicensed" for purposes of section 7031, subdivision (b).
14   

15   *Id.* at 520 (alteration in original) (emphasis added).  Thus, the terms of the prime contract between

16   the city and general contractor were determinative of what license the general contractor was

17   required to possess in *Jeff Tracy*.

18       WPEC opposes this aspect of the pending motion, relying on the decision in *Pacific

19   Caisson I*, 198 Cal. App. 4th 681.  (Doc. No. 86 at 11–12.)  There, a subcontractor sued its

20   general contractor to recover for work performed under the subcontract.  *Pac. Caisson I*, 198 Cal.

21   App. 4th at 685.  The subcontractor had a class A license but never had a class C-12 license.  *Id.*

22   at 686.  The *prime* contract between the general contractor and the county specified that a class C-

23   12 license was required to perform the subcontract work.  *Id.* at 687, 690, 693.  The class C-12

24   license requirement was incorporated by reference into the subcontract between the subcontract

25   and general contractor.  *Id.* at 689 n.2, 693.  Despite the express language of the prime contract

26   and subcontract, the subcontractor argued that its class A license was sufficient for purposes of

27   performing the subcontract work and "that the lesser or specialty license would have been

28   superfluous as it is fully encompassed within the Class A license requirements."  *Id.* at 690.  Like

1   DFJV here, the general contractor in *Pacific Caisson I* argued because the subcontractor "did not

2   hold [a Class A license] the County had designated, it was not duly licensed as provided for by

3   the statute." *Id.* at 692 (alteration in original).  In contrast to *Jeff Tracy* where the terms of the

4   prime contract controlled what license was required, the court in *Pacific Caisson* held that the

5   terms of the prime contract between the general contractor and the county could not dictate what

6   license the subcontractor was required to possess.  *Id.* at 693.  The state appellate court reasoned

7   that "dealings" between the prime contractor and the county cannot bind "third parties," such as

8   the subcontractor.  *Id.*  For this reason, the state appellate court disregarded the licensing

9   requirement of the prime contract and subcontract, and, instead, focused on comparing and

10  contrasting the scopes of work permitted under class A and C-12 licenses.  *Id.* at 691–93.

11  Ultimately, the court concluded that "Class A licensees are permitted to engage in the same work

12  as the Class C-12 license." *Id.* at 691.  In analyzing the issue in this fashion, *Pacific Caisson I*

13  stands for the proposition that the nature of the subcontract work and the scope of the

14  subcontractor's class A license was determinative as to what license was required by § 7031(a), at

15  least to some degree in apparent contradiction to the holding in *Jeff Tracy*.

16        But despite this seeming contradiction, the two cases can be reconciled by distinguishing

17  the nature of the different agreements at issue in *Pacific Caisson I* and *Jeff Tracy,* and by looking

18  at the distinct authority vested in California public entities under § 7059(b).  (*See* Doc. No. 86 at

19  11–12.)  Section 7059(b) provides that, in "public works contracts,"[21] the public entity or "the

20  awarding authority *shall determine* the license classification necessary to bid and perform the

21  project."  (emphasis added); *see also M & B Const. v. Yuba Cty. Water Agency*, 68 Cal. App. 4th

22  1353, 1359 (1999) (holding that the word "determine" under § 7059(b) "is used in the sense of

23  selecting, i.e., exercising some judgment or discretion, or whether it simply means the ministerial

24  act of identifying or listing").  When § 7059(b) is read together with § 7031(a), the public entity's

25  determination of what license a general contractor is required to hold under a prime contract is the

26

27  [21]  *See* Cal. Pub. Cont. Code § 1101 (defining "public work contract" as "an agreement for the
       erection, construction, alteration, repair, or improvement of any public structure, building, road,

28     or other public improvement of any kind.")

26

1   conclusive criterion for the type of license that prime contractor is required to hold under §

2   7031(a).  This reasoning was implicit in *Jeff Tracy* where the court held that the terms of the

3   prime contract between the city and general contractor were determinative of what license the

4   *general* contractor must possess because of § 7059(b).

5         In contrast, *Pacific Caisson I* stands for the proposition that §§ 7059(b) and 7031(a) do

6   not apply the same way to a contract between private entities.  In other words, if the public entity

7   is not a party to the contract in question, the terms of that contract are not dispositive of what type

8   of license the contractor is required to hold for purposes of § 7031(a).  Rather, the analysis turns

9   into a fact-intensive inquiry as to what license the contractor is required to possess in order to

10  perform the particular work described in the contract.  *See Pac. Caisson I*, 198 Cal. App. 4th at

11  691–92.  Because DFJV is not a public entity, neither § 7059(b) nor *Jeff Tracy* apply here.

12  Rather, the fact-intensive inquiry adopted in *Pacific Caisson I* is controlling here.  Consistent

13  with *Pacific Caisson I*'s guidance, the court will compare the nature of WPEC's subcontract work

14  with the scope of class A and C-10 licenses.  If the scope of C-10 work covers enough of the

15  work to be performed as described in the subcontract, then a jury must make the ultimate factual

16  determination as to whether WPEC's class C-10 license is sufficient to satisfy § 7031(a).

17        i.     Whether WPEC's Class C-10 License Was Sufficient to Cover the

18        Work Required by the Subcontract

19        In light of the conclusions reached above, the court now turns to the question of whether

20  WPEC's class C-10 license was sufficient under § 7031(a) for it to undertake the work required

21  by the subcontract and if that question is appropriately resolved on summary judgment.  As the

22  moving party, DFJV bears the initial burden of establishing that there is no genuine dispute of

23  material fact as to that issue.  The court begins by describing the respective scope of the two types

24  of licenses in question:  class C-10 (a specialty electrical contractor license) and class A (a

25  general engineering contractor license).  In general, a specialty subcontractor "is a contractor

26  whose operations involve the performance of construction work requiring *special skill* and whose

27  *principal* contracting business involves the use of specialized building trades or crafts."  Cal. Bus.

28  /////

1  & Prof. Code § 7058(a) (emphasis added).[22]  A C-10 licensee is a specialist in placing, installing,

2  erecting or connecting "any electrical wires, fixtures, appliances, apparatus, raceways, conduits

3  . . . or any part thereof, which generate, transmit, transform or utilize electrical energy in any form

4  or for any purpose."  Cal. Code Regs. tit. 16, § 832.10.  A class A general engineering contractor,

5  by contrast, is

6
7
8
9

> a contractor whose *principal* contracting business is in connection with fixed works requiring specialized engineering knowledge and skill, including the following divisions or subjects: . . . tunnels . . . excavating, grading, *trenching*, paving and surfacing work and cement and concrete works in connection with the above-mentioned fixed works.

10  Cal. Bus. & Prof. Code § 7056 (emphasis added).

11       The subcontract describes the scope of work to include "trenching and excavating";

12  "furnishing and installing" manholes; and "furnishing and installing" communication conduit

13  ductbank, conduit stubout at property line, barrel vaults, buried cable markers, PTS-3660

14  manhole, ground beds, steel casing, as well as providing tie-in support, at five different high-

15  speed rail intersections (namely Peach Avenue, Elkhorn Avenue, 9th Avenue, Cairo Avenue, and

16  Clovis Avenue).  (Doc. Nos. 82-3 ¶¶ 1, 15; 82-1, Ex. C (Fegan Decl.), Ex. C (Subcontract),

17  Attach. C at 444.)[23]  Construing the description of the subcontract work in light most favorable to

18  WPEC, the described work fits within both the scope of work under a class C-10 license—which

19  involves placing, installing, erecting or connecting any fixtures, appliances, and conduit, which

20  transmit "electrical energy in any form or for any purpose"—and of work under a class A

21  license—which involves trenching and excavating in connection with tunnels.[24]

22

23  [22] "The California Code of Regulations further subdivides specialty contracting work into
24  subclassifications."  *Pac. Caisson I*, 198 Cal. App. 4th at 689 (citing Cal. Code Regs., tit. 16,
    §§ 832.02–832.61).

25  [23] (*See* Doc. No. 93, Ex. S (Fegan Depo.) at 255:4–16 (DFJV's PMK conceding that the
26  subcontract accurately describes the work WPEC was to perform).)

27  [24] DFJV argues that WPEC was subcontracted to install "telecommunications infrastructure," not
    electrical work, but WPEC counters that installing conduit in connection to the
28  telecommunications infrastructure is electrical work.  (Doc. No. 85 ¶ 63.)

To attempt to satisfy its initial burden, DFJV has submitted the expert declaration of Cindi Christenson, a former Chief Deputy Registrar of the CSLB and Executive Officer of the Board of Professional Engineers and Land Surveyors, to show that WPEC's C-10 license was *inadequate* under § 7031(a).  (Doc. Nos. 82-1 at 29; 82-4 ¶¶ 55, 170) (citing Doc. No. 82-1, Ex. A (Christenson Decl.)).  Ms. Christenson concludes, based on her review of the subcontract and the bid documents,[25] that the scope of work consisted of an "earthmoving project," which would require "excavating trenches and tunnels," placing "heavy steel shoring plates in trenches," "laying out telecommunications appurtenances such as conduit and vaults," backfilling and compacting "the trenches using power compactors," among other activities.  (Doc. No. 82-1, Christenson Decl. ¶ 16[26].)  Ms. Christenson then opines that each of the mentioned work items requires a class A license to perform, so WPEC's C-10 license was insufficient.[27]  (*Id.* ¶¶ 16–17.)

---

[25]  (*See* Doc. Nos. 82-1, Ex. Q (DFJV's Bid Advertisement and Invitation to Bid) at 134 (stating that the subcontract work consists of "furnishing and installing . . . the AT&T and Frontier telecommunication infrastructure.").)

[26]  DFJV seems to have double counted paragraph 16 of Christenson's declaration and, therefore, the court's citation to paragraph 16 includes the doubled counted paragraph.

[27]  Ms. Christenson also suggests, without any apparent support, that WPEC was required to maintain a class A license to "oversee" the work specified in the subcontract, and that a "C-10 contractor would not have sufficient knowledge to coordinate, direct, and supervise the multiple disciplines covered by the Subcontract."  (Doc. No. 82-1, Christenson Decl. ¶ 16) (internal quotation marks omitted).  Legal precedent, however, contradicts this assertion.  The California Court of Appeal and Ninth Circuit have faced similar issues in deciding whether a specialty license alone, in absence of a general license, was sufficient to satisfy CSLL's licensing requirements, but neither considered nor held that possessing a general license (i.e. a class A license) was necessary to perform a specialty license work (i.e. a class C license work.).  *See MP Nexlevel of California, Inc v. CVIN, LLC*, 740 F. App'x 881 (9th Cir. 2018); *Pac. Caisson I*, 198 Cal. App. 4th 681.  In any event, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."  *Nationwide Transp. Fin. v. Cass Info. Sys.*, Inc., 523 F.3d 1051, 1058 (9th Cir. 2008).  And to the extent Ms. Christenson is offering an opinion regarding an issue of fact, her declaration is not probative because she has laid no evidentiary foundation to support her opinion regarding the factual matter and there is no such evidence in the record.  *See United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638–39 (9th Cir. 2012) ("[A] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact . . . ."); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (It is *not* the task of "the district court, to scour the record in search of a genuine issue of triable fact.").

1    WPEC disputes Ms. Christenson's assessment, though not in totality.  WPEC contends

2   that although it was to perform certain tasks covered under a class A license, those tasks were

3   only "incidental and supplemental" to the C-10 license work it was to perform.  (Doc. Nos. 86 at

4   12–13; 92 ¶ 188.)  The "incidental and supplemental" argument is a legal exception codified in

5   § 7059(a).  The statute permits WPEC to perform "trenching" and "excavation" in connection

6   with tunnels without holding a class A license if such performance "is *incidental* and

7   *supplemental* to the performance of the work in the craft for which the specialty contractor is

8   licensed," i.e., its C-10 license.  Cal. Bus. & Prof. Code § 7059(a) (emphasis added).  "Incidental

9   and supplemental" under § 7059(a) has been defined by the CSLB through regulation[28] as work

10   that "is *essential* to accomplish the work in which the contractor is classified."  Cal. Code Regs.

11   tit. 16, § 831 (emphasis added).  Relying on this regulatory definition, WPEC argues that the

12   trenching, excavation, and infrastructure placement aspects of its work are "essential" to

13   furnishing and installing the conduits, barrel vaults, and other objects that WPEC was to perform

14   under the subcontract.  (Doc. No. 86 at 12–13.)  Therefore, holding a C-10 license was sufficient,

15   and holding a class A license was *unnecessary* because class A license work was "incidental and

16   supplemental" to C-10 work.  *Id.*

17    WPEC's reasoning rests on the unpublished Ninth Circuit decision in *MP Nexlevel of*

18   *California, Inc v. CVIN, LLC*, 740 F. App'x 881 (9th Cir. 2018).[29]  In that case the appellant-

19   plaintiff was "contracted to excavate, trench, drill, and construct underground conduit to carry [ ]

20   fiberoptic cables."  *MP Nexlevel*, 740 F. App'x at 882.  The Ninth Circuit took as a given the fact

21   that the excavation, trenching, drilling, and underground construction tasks did not fall directly

22   within the scope of MP Nexlevel's C-7 license, a specialty license that allowed a contractor to

---

[28]  The CSLB is tasked with the responsibility to "adopt reasonably necessary rules and regulations to effect the classification of contractors in a manner consistent with established usage and procedure as found in the construction business," Cal. Bus. & Prof. Code § 7059(a), and to "make such rules and regulations as are reasonably necessary to carry out the provisions" of the CSLL, Bus. & Prof. § 7008.

[29]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   install, service, and maintain "all types of communication and low voltage systems." *Id.* at 882–

2   83.  Applying the interpretation of "incidental and supplemental" under California Code of

3   Regulations, title 16, section 831 as "essential," the Ninth Circuit reasoned, "'[c]ommunications

4   systems inherently and necessarily require some connection to other points of contact.  Otherwise,

5   there is no 'communication' or 'system.'  To facilitate that connection, some infrastructure is also

6   necessary." *Id.* at 883.  The Ninth Circuit therefore concluded that class A license's infrastructure

7   work such as excavation, trenching, and drilling was "essential" to and therefore "incidental and

8   supplemental to the installation of the fiberoptic systems," which work the appellant-plaintiff was

9   licensed to perform under a C-7 license.  *Id.* at 882–83.  WPEC argues that this court should

10  follow *MP Nexlevel* and use "essential" as the equivalent of "incidental and supplemental."  (Doc.

11  No. 86 at 13.)  Applying that legal standard here, WPEC argues that since trenching, excavation,

12  and infrastructure placement under class A license was *essential* to the C-10 work of furnishing

13  and installation of fixtures, appliances, and conduits to transmit "electrical energy in any form or

14  for any purpose," the former was *incidental and supplemental* to the latter.  (*Id.*)

15      DFJV disagrees with this interpretation and attempts to distinguish *MP Nexlevel* by

16  arguing that "the contract at issue in [*MP Nexlevel*] did not contain an A General Engineering

17  License requirement," so "the analysis in *MP Nexlevel* is not dispositive on the resolution of the

18  licensing issues in this case."  (Doc. No. 98 at 4.)  The court finds DFJV's argument in this regard

19  unpersuasive.  The underlying issue in *MP Nexlevel* that is relevant here is whether "incidental

20  and supplemental" under § 7059(a) mean the same as "essential," regardless of what license a

21  particular contract requires.[30]  For this reason, DFJV has failed to show that *MP Nexlevel* is

22  inapplicable in resolving the question before this court.

23      More importantly, DFJV has cited no authority defining the meaning of "incidental and

24  supplemental" under § 7059(a), notwithstanding *MP Nexlevel*'s reliance the CSLB's regulatory

25  definition.  (*See* Doc. No. 82-1 at 26–30.)  Instead, DFJV argues, as a factual matter, that the

26

27  ───────────────
    [30]  The court has also addressed above the legal implication of the subcontract requiring WPEC to
    possess a class A license and found that requirement *not* to be dispositive for purposes of
28  analyzing § 7031(a) compliance in this case.

subcontract work at issue here "consisted *primarily* of trenching and excavation to install

conduit," which must be performed with a class A license, so that "West Pacific's C-10 specialty

license was not adequate to allow it to perform the work required under the Subcontract." (*Id.* at

26–27.)  DFJV appears to simply assume "incidental and supplement" means "minor or

subordinate to something that is primary," and since the WPEC's class A work *is* the primary

work required by the subcontract, such work could *not* be "incidental or supplemental" to the C-

10 work.[31]  In support of this position, Ms. Christenson, DFJV's expert, opines:

> Based on my review of the content of the "A" examination as it
> relates to the skills needed to perform the Subcontract, it is my
> opinion that the Project required 20 of the 28 skills tested by the "A"
> license exam.  In contrast, the "C-10" examination tests very few of
> the skills needed to perform the Subcontract.  WPECC performed
> only 3 of the 26 skills listed in the C-10 license exam.[32]

(*Id.*, Christenson Decl. ¶ 17.)  "Because the nature of the work was heavily weighted to requiring

an 'A' license" based a comparison of the CSLB's exam study guides for class A and C-10

licenses, Christenson concludes that the class A license work "could not be incidental and

supplemental to the 'C-10' covered work."  (*Id.*)  But even if the court were to accept

Christenson's declaration as true in this regard, it is *immaterial* to the determination of whether

WPEC's class A work is "incidental and supplemental" to its C-10 work.  Under *MP Nexlevel*,

the legal standard for "incidental and supplemental" is whether a particular work "essential to

---

[31]  DFJV's assumption is not entirely baseless.  As a matter of ordinary meaning, Black's Law Dictionary defines "incidental" as "[s]ubordinate to something of greater importance; having a minor role."  Incidental Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw.  Merriam-Webster Dictionary defines "incidental" as "subordinate, nonessential, or attendant in position or significance."  *Incidental*, *Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/incidental.  And the American Heritage Dictionary defines "incidental" as, "Of a minor, casual, or subordinate nature."  *Incidental*, *American Heritage Dictionary*, https://www.ahdictionary.com/word/search.html?q=incidental*; see also In re Rojas*, 23 Cal. 3d 152, 155 (1979) ("In engaging in statutory interpretation we are to accord words their usual, ordinary, and common sense meaning based on the language the Legislature used and the evident purpose for which the statute was adopted.").

[32]  Christensen describes that she is looking at the license examinations to reach her conclusion, but the hyperlinks and evidence she references in the declaration are the CSLB's study guides, *not* the examinations.

accomplish the work in which the contractor is classified," California Code of Regulations tit. 16, § 831—*not* "minor to something else that is primary."  *See MP Nexlevel*, 740 F. App'x at 882–83. Put in practical terms, even if the class A work of excavating and trenching constitutes a significant portion of WPEC's work, it could still be "essential" to the C-10 work of furnishing and installing the conduits, barrel vaults, and other objects that WPEC was subcontracted to perform.  As WPEC argued, without first trenching and evacuating the areas, it could not have furnished and installed conduits, barrel vaults, and other objects underground.  (*See* Doc. No. 86 at 13; *see also* Doc. No. 82-1 at 26 (DFJV appearing to concede that WPEC had to "trench[] and excavat[e] to install conduit[s].").)  For these reasons, the court finds that WPEC has demonstrated the existence of a genuinely disputed issue of material fact as to whether its class A work *could* be incidental and supplemental to its C-10 work.

But even if the court were to apply the legal standard of "incidental and supplemental" as "minor to something else that is primary," Christenson's affidavit would still *not* be sufficiently conclusive to provide a basis for the granting of summary judgment.[33]  According to Christenson,

---

[33]  While *MP Nexlevel* is persuasive authority and has interpreted "essential" as the equivalent of "incidental and supplemental," the California Court of Appeal has defined "incidental" to "obviously" mean "depending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal, something incidental to the main purpose."  *Currie v. Stolowitz*, 169 Cal. App. 2d 810, 814 (1959); *Kelly v. Hill*, 104 Cal. App. 2d 61, 65 (1951).  Of course, "the federal court *must* follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it."  *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) (emphasis added).  California appellate courts have focused not only on the idea that an "incidental and supplemental" activity must be "necessary"; it also must be truly "incidental."  *See supra* note 31; *see, e.g.*, *District Council 50, of International Union of Painters & Allied Trades v. Lopez*, 129 Haw. 281, 286, 291–92 (2013) (Hawaii Supreme Court rejecting the Hawaii Contractors License Board's definition of "incidental and supplemental" as simply "necessary" because it would create "a loophole for C–5 contractors to complete unlimited amounts of specialty work for which they do not hold the requisite specialty licenses," and instructing the Board to reconsider the case "in light of the cost and extent of work involved.").  There appears to be a conflict between the California appellate authorities and Ninth Circuit's decision in *MP Nexlevel*.  If this case proceeds to trial, the court will likely be required to resolve this conflict of authorities in order to properly instruct the finder of fact on the definition of "incidental and supplemental" under the law.  However, the court declines to make that determination at this stage of the proceedings for two reasons.  First, as discussed in the body of this decision, DFJV has failed to argue and provide authority with respect to the legal standard in defining "incidental and supplemental" that it wishes this court to adopt.  Second, even if the

1   WPEC's class A license work could *not* be incidental and supplemental to the C-10 work because

2   WPEC is required to use only *three* skills covered in the C-10 study guide, but also 20 skills

3   covered in the A license study guide.  No authorities under California law have adopted

4   Christenson's methodology of counting the number of skills in study guides to determine whether

5   a particular work specified in a contract is "incidental and supplemental," nor has DFJV cited to

6   any.  Invariably, California courts have simply compared the contract work, on one hand, *with* the

7   relevant statutes or regulations describing the works covered under the relevant licenses, on the

8   other hand, to make the determination as to the incidental-and-supplemental issue.  *See, e.g.*, *MP

9   Nexlevel*, 740 F. App'x 881 (comparing the description of contract work with the scope of C-7

10  license); *Banis*, 134 Cal. App. 4th at 1047 ("Plaintiff has offered no specifics to explain how any

11  portion of the contract is incidental to any other, or why any portion should be severed from any

12  other portion."); *Vallejo*, 24 Cal. App. 4th at 944 (comparing the parties' terms of contract with

13  the actual work performed); *Roy Bros.*, 123 Cal. App. 3d at 184–85 (comparing the work

14  contracted to perform with the relevant statutes and regulations); *Walker*, 97 Cal. App. 3d at 847–

15  48 (comparing the work performed under the contract with the relevant statutes); *Johnson v.

16  Mattox*, 257 Cal. App. 2d 714, 717–18 (1968) (same); *Kelly*, 104 Cal. App. 2d at 63–65 (same).

17          Setting aside Christenson's novel methodology and considering her assertion on the

18  merits, the court cannot say that DFJV has established that WPEC's class A work cannot be

19  incidental and supplemental to its C-10 work.  The Christenson declaration fails in this regard for

20  several reasons.  Most significantly, Christenson assumes without explanation or justification that

21  the number of skills used necessarily equates to the proportion of the C-10 and the A work that

22  WPEC had to perform under the subcontract.  (*See* Doc. No. 82-1, Christenson Decl. ¶ 17.)  The

23  Ninth Circuit has held that unsupported or unexplained assumption in an expert opinion may

24  render that opinion inadmissible for purposes of summary judgment.  *See, e.g.*, *Alameda Books,

25  Inc. v. City of Los Angeles*, 631 F.3d 1031, 1041 (9th Cir. 2011) (holding that "unsupported

26

27  court were to adopt DFJV's preferred standard or definition, as will be explained above, there
    would *still* be a genuine disputed issue of material fact precluding the granting of summary
28  judgment in this case.

1   assumption of a relationship between the current profitability of adult arcades and their viability

2   as free-standing units" renders the expert's declaration inadmissible under Rule 702 on summary

3   judgment); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (reversing the district

4   court decision to admit expert opinion evidence based solely on "general qualifications" without

5   requiring an explanation of the method used in reaching the conclusion);[34] *see also, e.g.*, *United*

6   *States v. Cecil*, 836 F.2d 1431, 1440–41 (4th Cir. 1988) (holding that the failure to identify the

7   criteria of "narcissistic personality disorder" in the assessment of a witness's mental health and

8   the unsupported assumptions made about the witness rendered the psychiatrist's evaluation

9   inadmissible under Rule 702); *Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 842 (S.D. Cal.

10   2020) (denying the admission of an expert's opinion under Rule 702 because the expert fails to

11   provide "sufficient information" to assess reliability).  The unexplained and unsupported

12   assumption underlying Christenson's opinion does not hold water here because WPEC may, for

13   instance, need only three skills covered under the C-10 license study guide to perform 70% of the

14   work specified in the subcontract.  Moreover, Christenson relies on the number of skills listed in

15   the study guides, but fails to account for each skill's relative weight vis-à-vis other skills.  For

16   example, a single skill in the class A study guide represents 6% of the overall content, while four

17   other skills combined represent 5% of the overall content.  (*See* Doc. No. 82-1, Christenson Decl.

18   ¶ 17, citing Ex. S.)  While this "bean counting" approach may convince a jury, it cannot be found

19   to be dispositive for purposes of summary judgment, where DFJV must establish that *no* genuine

20   dispute of material fact exists and that it is entitled to judgment as a matter of law.  Viewing the

21   evidence in the light most favorable to WPEC, the court finds that the Christenson's declaration is

22   insufficient to meet that standard.  Accordingly, summary judgment on the issue of "incidental

23   and supplemental" against WPEC and in favor of DFJV will be denied.

24   　　　　　　3.   Whether DFJV Must be Duly Licensed to Proceed on Its Cross-Complaint

25   　　　　In addition to seeking judgment in its favor as discussed above, DFJV also seeks summary

26   judgment on its cross-complaint for disgorgement under the CSLL.  Section 7031(b) specifies, in

---

[34] *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) ("It is well settled that bare qualifications alone cannot establish the admissibility of . . . expert testimony.").

1   relevant part, that "a person who utilizes the services of an unlicensed contractor may bring an

2   action . . . to recover all *compensation* paid to the unlicensed contractor for performance of any

3   act or contract."  This is known as disgorgement, *see Twenty-Nine Palms Enterprises Corp. v.*

4   *Bardos*, 210 Cal. App. 4th 1435, 1449 (2012), also described as "a 'sword' [that] consumers [may

5   use] against unlicensed contractors," *Jeff Tracy*, 240 Cal. App. 4th at 521 (alteration in original).

6   Rather than disputing the merits of DFJV's cross-claim under § 7031(b), WPEC argues, as a

7   preliminary matter, that DFJV must be duly licensed as required by § 7031(a) in order to bring

8   such cross-claim for disgorgement.  (*See* Doc. No. 86 at 10.)  DFJV counters that § 7031(a) is

9   applicable *only* to a plaintiff bringing a complaint, but not to a party bringing a cross-complaint.

10  (Doc. No. 98 at 2.)  DFJV cites no authorities in support of its interpretation of § 7031(a).  (*Id.*)

11  This is a preliminary issue of law that the court must decide before reaching the merits of DFJV's

12  motion for summary judgment on the cross-complaint.[35]

13          To determine whether § 7031(a) requires DFJV to be a duly licensed contractor to bring

14  its cross-complaint, the court begins again with the plain language of the statute.[36]

15  *Conservatorship of Whitley*, 50 Cal. 4th 1206, 1214 (2010) ("We begin with the statutory

16  language because it is generally the most reliable indication of legislative intent.").  Section

17  7031(a) states in pertinent part, "no person engaged in the business or acting in the capacity of a

18  *contractor* . . . may bring or maintain any *action* . . . for the collection of compensation for the

19  performance of any act or contract where a license is required by this chapter."  (emphasis

20  added).  DFJV argues that the term "action" is exclusive of a cross-complaint.  (*See* Doc. No. 98

21  at 2.)  But as a matter of California civil procedure, an "action" includes a "*cross-complaint* or

22  other *pleading* that asserts a cause of action or claim for relief."  Cal. Code Civ. Proc.

23  § 583.110(a); *see also* Cal. Code Civ. Proc. § 422.10 (defining "pleadings" in civil actions to

24  mean "complaints, demurrers, answers, and cross-complaints").  Because DFJV's cross-

25  _____

26  [35]  Had DFJV simply produced evidence of its licensure, the court could have avoided the issue.
    Because DFJV has not done so, the court must address this question of law.  (*See* Doc. No. 98 at

27  2).

28  [36]  *See also supra* note 15.

1  complaint asserts a claim for disgorgement, it is an "action" for purposes of § 7031(a).

2       There is a split of authority among California appellate courts on this issue.  Three

3  California appellate districts agree with this conclusion, and one appellate district reached the

4  opposite conclusion.  The earliest published opinion addressing this issue was *Holm v. Bramwell*,

5  20 Cal. App. 2d 332 (1937), where a general contractor sued an unlicensed subcontractor for

6  disgorgement of payment made.  *Holm*, 20 Cal. App. 2d at 333–34.  In that case, the appellate

7  court construed § 12[37] of the CSLL, the predecessor of today's § 7031(a), to apply "to a

8  subcontractor as well as to a contractor" seeking relief.  *Id.* at 335.  Relying on this reading of §

9  12, the court held that the "contract between the plaintiff and his subcontractor, who was not

10 licensed as required by law, was illegal and void," so the general contractor was barred from

11 seeking disgorgement based on a void contract.  *Id.* at 335, 338.  The same conclusion was later

12 reached in *Currie v. Stolowitz*, 169 Cal. App. 2d 810, 812 (1959), though, on a different rationale

13 than that adopted in *Holm*.  In *Currie*, an *unlicensed* general contractor contracted with a property

14 owner to renovate a building and later subcontracted plumbing work in connection with the

15 renovation.  *Currie*, 169 Cal. App. 2d at 812–13.  After the subcontractor allegedly failed to

16 complete the plumbing work, the unlicensed general contractor brought a breach-of-contract

17 action against the subcontractor.  *Id.* at 812.  The court in *Currie* construed § 7031(a) to bar the

18 *unlicensed* contractor's "suit for breach of contract as well as for the collection of compensation

19 for performance of any act" against the subcontractor.  *Id.* at 813.

20      Finally, in *Ranchwood Communities Limited Partnership v. Jim Beat Construction Co.*,

21 49 Cal. App. 4th 1397 (1996), several *unlicensed* general contractors brought a cross-action

22 /////

23 /////

24 /////

25 /////

26

27 [37]  Section 12 stated, in substantial similar terms to today's § 7031(a), as follows:  "Any person who acts in the capacity of a contractor within the meaning of this act without a license as herein provided, and any person who conspired with another person to violate any of the provisions of

28 this act, is guilty of a misdemeanor."  *Holm*, 20 Cal. App. 2d at 335.

1   against the subcontractors for express indemnification.[38]  *Ranchwood*, 49 Cal. App. 4th at 1403–

2   05.  The issue in that case, as relevant here, was "whether the licensing law, properly interpreted,

3   bars all the causes of action in the cross-complaints."  *Id.* at 1409.  Homing in on the meaning of

4   "compensation" under § 7031(a), the state appellate court reasoned, "[e]xpress indemnity

5   payments are very similar to breach of contract damages in this context, and the contracts here

6   (construction subcontracts) are illegal due to the lack of a developer/general contractor license, so

7   they may *not* be enforced and *no* compensation can be sought under them."  *Id.* at 1418 (emphasis

8   added).  In short, the appellate court found that "compensation" under § 7031 included not only

9   ordinary breach-of-contract damages, but also indemnity payments in a cross-action.  *Id.*  For this

10   reason the appellate court concluded that, "the contract-based causes of action of the cross-

11   complaint are inseparable from the construction subcontracts and recovery on those subcontracts

12   in the form of express indemnity *cannot* be sought by the unlicensed general contractors" under

13   § 7031(a).  *Id.* (emphasis added).  Altogether, the decisions in *Holm*, *Currie*, and *Ranchwood* lend

14   support to WPEC's theory that if DFJV was unlicensed, it is barred from seeking disgorgement

15   by way of its cross-complaint.

16        Notwithstanding the foregoing, in *Gaines v. Eastern Pacific*, 136 Cal. App. 3d 679

17   (1982), the state appellate court construed § 7031(a) and reached the opposite conclusion from

18   that reached in *Holm*, *Currie*, and *Ranchwood*.  The subcontractor in *Gaines* sued an unlicensed

19   contractor for breach of contract; in response, the unlicensed contractor counter sued for the

20   subcontractor's defective work.  *Gaines*, 136 Cal. App. 3d at 681–82.  The appellate court

21   focused on the terms "compensation for the performance" under § 7031(a) and construed those

22   terms to exclude "the recovery on the cross-complaint" because the unlicensed contractor "was

23   not suing to recover compensation under the contract."  *Id.* at 683.  On this basis, the court held

24   that the *unlicensed* contractor "was not barred from recovery" on its cross-complaint by §

25

26   [38]  The homeowners' association also filed complaint against the general contractors for
construction defect.  *Ranchwood*, 49 Cal. App. 4th at 1403–05.  The Fourth District recognized

27   that the general contractors had dual roles as contractors and developers, and those roles had
different legal implications.  *Id.* at 1404, 1409, 1413–14.  These facts are not relevant here,

28   however, and need not be elaborated in detail.

1  7031(a).[39]  *Id.*  *Gaines* stands as the only decision by a California appellate court supporting

2  DFJV's position here.

3        In the end, the undersigned is not persuaded by *Gaines* and finds the weight of authority

4  as expressed in *Holm*, *Currie*, and *Ranchwood* to be more convincing.  The court in *Gaines*

5  justified its conclusion by narrowly construing the terms "compensation for the performance"

6  under § 7031(a) to be exclusive of a cross-action.  *See Gaines*, 136 Cal. App. 3d at 683.  This

7  reading does not appear to be consistent with California Code of Civil Procedure § 583.110(a),

8  which defines the term "action," as that term appears in § 7031(a), to include a "*cross-complaint*

9  or *other pleading* that asserts a cause of action or claim for relief."  *See also* Cal. Code Civ. Proc.

10  § 422.10.

11        Moreover, "'the [California] Legislature did not intend the term 'compensation' as used in

12  [§ 7031(a)] to be narrowly construed; rather, it 'should be read in its usual and ordinary sense,

13  which imports *payment* or reward in *any* form.'"  *Ahdout*, 213 Cal. App. 4th at 32 (alteration in

14  the original) (emphasis added).  Another California Court of Appeal has also defined the term

15  "compensation" as used in § 7031(a) to "denote[] sums claimed as an *agreed price*, fee or

16  percentage earned by performance, and also sums claimed as the reasonable value of work done

17  under implied contract.'"  *UDC-Universal Dev., L.P. v. CH2M Hill*, 181 Cal. App. 4th 10, 26

18  (2010) (alteration in original) (citation omitted).  The $322,278.71 in payments DFJV made to

19  WPEC is certainly a performance or payment contemplated by the subcontract, and that payment

20  constitutes the *agreed price* of the subcontract.  Applying this ordinary reading of "compensation

21  for the performance," the reading of those terms by the court in *Gaines* to exclude a cross-

22  complaint brought by DFJV to recover payment under a contract appears inconsistent with the

23  /////

24  /////

---

25  [39]  The court in *Gaines* also noted an independent reason in reaching its conclusion:  that the

26  unlicensed contractor there substantially complied with the licensing requirements of § 7031(a).
   *Gaines*, 136 Cal. App. 3d at 682–83.  *But see Pac. Custom*, 79 Cal. App. 4th at 1261–62

27  (disapproving the broad application of the substantial compliance doctrine adopted in *Gaines* and
   noting that legislative amendments to § 7031 in 1989 and 1994 had significantly narrowed the

28  application of that doctrine).  This alternative reasoning is not relevant here.

1    statute's text.[40]  *See People v. Robinson*, 47 Cal. 4th 1104, 1138 (2010) (holding that courts "must

2    look to the statute's words and give them their usual and ordinary meaning."); *see also Kurtin*,

3    215 Cal. App. 4th at 471–72 ("All else being equal, however, courts prefer a more natural reading

4    of text to a less natural one . . . .").

5         For reasons stated above, the court construes § 7031(a) to require DFJV to prove that it

6    was a duly license contractor during the performance of the subcontract in order to recover on its

7    cross-complaint.  Because DFJV has failed to present evidence on summary judgment

8    establishing that it was a duly licensed contractor, it is not entitled to summary judgment on its

9    cross-complaint.[41]  Accordingly, the court need not reach the merits of whether DFJV is entitled

10   to summary judgment on its cross-complaint for disgorgement.

11   **D.    WPEC's First, Third, and Fourth Claims**

12        Since the court has found that summary judgment on the entire complaint or cross-

13   complaint is inappropriate, DFJV alternatively asks the court for partial summary judgment in its

14   favor on WPEC's first, third, and fourth claims for rescission by fraud, fraudulent concealment,

15   and violation of California Business & Professions Code § 17200, respectively.  (Doc. No. 82-1 at

16   30.)  For the reasons set forth below, the court will also deny this alternative request.

17        1.    First and Third Claims Based on Fraudulent Concealment

18        WPEC labels its first claim as one for "rescission of contract based on fraud" and its third

19   claim as one for "fraud/concealment."  (Doc. No. 1 at 5, 7.)  Although the two claims are pled

20   _____

21   [40]  The state appellate court's reading of § 7031(a) in *Gaines* relied exclusively on *American
     Sheet Metal, Inc. v. EM-KAY Engineering Co., Inc.*, 478 F. Supp. 809 (E.D. Cal. 1979).  *See*

22   *Gaines*, 136 Cal. App. 3d at 683.  *But see Pac. Custom*, 79 Cal. App. 4th at 1267 (declining to
     follow *American Sheet Metal*); *Ranchwood*, 49 Cal. App. 4th at 1411–12 (same).  Notably,

23   neither the court in *Gaines* nor *American Sheet Metal* addressed the earlier, contrary decisions in
     *Holm* and *Currie*.  *See Gaines*, 136 Cal. App. 3d at 683; *Am. Sheet Metal*, 478 F. Supp. at 813–

24   14.  This is significant because in California, "[i]t is settled that if a decision departed from an
     established general rule without discussing the contrary authority, its weight as precedent is

25   diminished."  *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal. 4th
     1169, 1180 (2013).

26

27   [41]  DFJV may have proof that it was a duly licensed contractor during the performance of the
     subcontract and would be able establish that at trial.  The court need not address that question

28   here, however.

separately, both are essentially the same claim for fraudulent concealment and will be analyzed

under the same theory.  (*See also* Doc. Nos. 82-1 at 30–36 (DFJV arguing both claims under the

same theory of fraudulent concealment); 86 at 17–25 (WPEC arguing the same).)  Fraudulent

concealment is one of four species of fraud in California.  *See* Cal. Civ. Code § 1710; *Finch*

*Aerospace Corp. v. City of San Diego*, 8 Cal. App. 5th 1248, 1252–1253 (2017) (the others are

negligent misrepresentation, intentional misrepresentation, and promissory fraud).  By statute,

fraudulent concealment is "[t]he suppression of a fact, by one who is bound to disclose it, or who

gives information of other facts which are likely to mislead for want of communication of that

fact."  Cal. Civ. Code § 1710(3).  As the California Court of Appeal has explained, the gist of a

fraudulent concealment claim is the creation of

> a false impression upon the mind of the other party; and, if this result
> is accomplished, it is unimportant whether the means of
> accomplishing it are words or acts of the defendant, or his
> concealment or suppression of material facts not equal within the
> knowledge or reach of the plaintiff.

*Sime v. Malouf*, 95 Cal. App. 2d 82, 100 (1949).

Critical to WPEC's theory of claim in this regard, the California Supreme Court has held

that "by failing to impart its knowledge of difficulties to be encountered in a project, the

[contractor] will be liable for misrepresentation if the [subcontractor] is unable to perform

according to the contract provisions."  *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d

285, 294 (1970) (alteration in original) (citations omitted).  In this case, WPEC claims that DFJV

failed to impart knowledge of the difficulties WPEC would encounter in performing the

subcontract given the following contractual provisions:

> [3.2] The Contractor shall not start construction (or recommence
> construction following any suspension) of any portion of the Project
> until all the following events have been fully satisfied with respect to
> the Work proposed to be constructed:
>
> \*\*\*
>
> d. All necessary *rights of access* for such portion of the Project have
> been obtained . . . ."

/////

/////

41

1   (Doc. Nos. 1 at ¶ 21; 82-1, Fegan Decl., Ex. A (Prime Contract) ¶ 3.2(d)) (emphasis added).[42]

2   
3
> Subcontractor *must* complete all work to achieve substantial completion . . . within 90 Calendar Days of Notice to Proceed (Execution of Subcontract) . . . [or by] 02/28/2017.

4   (Doc. No. 93, Ex. J, Attach. C at 73) (emphasis added).

5        WPEC asserts that DFJV knew—at the time the subcontract was executed—that *not* all

6   necessary ROWs (rights of way) had been obtained, namely those at the Elkhorn Avenue

7   location, and, as a result, WPEC might encounter difficulties substantially completing the

8   subcontract work by February 28, 2017.  (Doc. Nos. 1 ¶¶ 24–27; 85 ¶¶ 82, 87–88; 86 at 17–18.)

9   DFJV purportedly suppressed or concealed that information from WPEC so WPEC would be

10  fraudulently induced into signing the subcontract.  (Doc. Nos. 1 ¶¶ 24–27; 85 ¶¶ 82, 87–88; 86 at

11  17–18.)  Because of the concealment, WPEC mistakenly believed that all the necessary ROWs

12  had been acquired and that it would substantially complete the subcontract by February 28, 2019.

13  (Doc. No. 86 at 24) (citing Doc. Nos. 88 ¶ 4; 92 ¶ 185); (*see also* Doc. No. 89 ¶¶ 33–34.  Due to

14  these mistaken beliefs, WPEC signed the subcontract.[43]  (Doc. Nos. 1 ¶ 28; 86 at 24) (citing Doc.

15  No. 88 ¶ 4); (*see also* Doc. No. 89 ¶¶ 33–34.)

16       To establish its fraudulent concealment claim, WPEC must prove that

17   
18   
19   
20
> (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage.

21

22   _____

[42]  The cited provision in the prime contract is incorporated by reference into the subcontract.

23

24  [43]  WPEC argues that DFJV asserted two half-truths:  "(a) that construction would not commence on any portion of the Project until all necessary rights of way had been obtained (contained in the

25  Prime Contract); and (b) that all of WPECC's Subcontract work was to be substantially complete within 90 calendar days from the date the Subcontract was executed (contained in the

26  Subcontract)."  The focus of the court's analysis above is on the alleged *second* half-truth.  The court is not persuaded that the *first* "half-truth" is material, or even actionable.  Practically

27  speaking, it is unclear how—even if WPEC started work on the project early because of DJFV's concealment—the first "half-truth" caused WPEC to be "unable to perform according to the

28  contract provisions."  *Warner Constr.*, 2 Cal. 3d at 294.

1   *Burch v. CertainTeed Corp.*, 34 Cal. App. 5th 341, 348 (2019).[44]   DFJV argues that there is no

2   genuine dispute of material fact as to the second, third, and fourth elements of duty, intent, and

3   reliance, so summary judgment should be granted in its favor as to WPEC's fraudulent

4   concealment claim.  (Doc. No. 82-1 at 30–36.)  Because DFJV is a defendant, only one of the

5   three elements needs to be negated indisputably for DFJV to be entitled to summary judgment on

6   this claim brought by WPEC.  The court has considered DFJV's arguments with respect to all

7   three elements of WPEC's fraudulent concealment claim and, for the reasons explained below,

8   finds that DFJV is not entitled to partial summary judgment as to that claim.

9               a.  *Duty*

10          The court begins with duty.  Where "material facts are known to one party and not to the

11   other, failure to disclose them is *not* actionable fraud *unless* there is some relationship between

12   the parties which gives rise to a *duty* to disclose such known facts."  *Hoffman v. 162 N. Wolfe*

13   *LLC*, 228 Cal. App. 4th 1178, 1187 (2014) (emphasis added); *see also Thompson Pac. Constr.,*

14   *Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 552 (2007) ("[S]ilence alone is not actionable.").

15   Thus, where "a sufficient relationship or transaction does not exist, no duty to disclose arises even

16   when the defendant speaks."  *Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 312 (2017)

17   (citation omitted).  A sufficient relationship has been found "when the defendant is in a fiduciary

18   relationship with the plaintiff," or when it is "a result of some sort of transaction between the

19   parties," e.g., "between seller and buyer, employer and prospective employee, doctor and patient,

20   or parties entering into any kind of *contractual* agreement."  *LiMandri v. Judkins*, 52 Cal. App.

21   4th 326, 336–37 (1997) (emphasis added).  There is no dispute here that the parties were in a

22   contractual or transactional relationship.  (*See* Doc. No. 82-3 ¶¶ 21, 24, 28.)

23   /////

24   /////

---

25   [44]  Even though an affirmative misrepresentation is *not* an element of fraudulent concealment,

26   DFJV argues in reply that WPEC must establish an affirmative misrepresentation to succeed on its fraudulent concealment claim.  (*See* Doc. No. 98 at 6–7.)  This is the first time DFJV raises

27   this issue.  (*Compare* Doc. No. 82-1 *with* Doc. No. 98 at 6–7.)  "The district court need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990,

28   997 (9th Cir. 2007) (citation omitted).  Thus, DFJV's argument fails on this basis alone.

When there is a contractual relationship between parties, a duty to disclose

> may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff.

*Bigler-Engler*, 7 Cal. App. 5th at 311–312 (citations omitted).  WPEC argues that there is a genuine dispute of fact as to all three circumstances here thus precluding the granting of summary judgment.  (*See* Doc. No. 82-1 at 29–30.)  To negate the element of duty, DFJV must show that there is no genuine dispute of material fact as to all three circumstances.  Since the court finds that DFJV has failed satisfy its burden as to the first circumstance on summary judgment, the court need not address the remaining circumstances.

A duty to disclose arises in the first circumstance when "the defendant makes representations but fails to disclose additional facts which materially qualify the facts disclosed, or which render the disclosure likely to mislead."[45]  *Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 666 (1996).  "[T]he telling of a half-truth calculated to deceive is fraud."  *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 292 (2004).  To avoid committing fraudulent concealment, it is "necessary to clarify misleading 'half-truths.'"  *Bigler-Engler*, 7 Cal. App. 5th at 312.  It is by making a half-truth representation that DFJV allegedly failed "to impart its knowledge of difficulties" that WPEC would encounter in performing the subcontract work, so DFJV may be liable for fraudulent concealment if WPEC was "unable to perform according to the contract provisions."  *Warner Constr.*, 2 Cal. 3d at 294 (citations omitted).

---

[45]  As the Supreme Court explains,

> A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property.  The enumeration of two streets, described as unopened but projected, was a tacit representation that the land to be conveyed was subject to no others, and certainly subject to no others materially affecting the value of the purchase.

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000 (2016) (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (1931) (Cardozo, J.)).

1    Here, DFJV supposedly made a half-truth representation to WPEC by requiring WPEC to

2    substantially complete its project by February 28, 2017, while concealing from WPEC facts in

3    DFJV's possession suggesting it would be difficult or impossible to meet that deadline.

4    Specifically, it is asserted that DFJV failed to disclose to WPEC the fact that *not* all the ROWs at

5    the Elkhorn Avenue location had been acquired at the time the subcontract was executed.[46]  (Doc.

6    Nos. 1 at ¶¶ 21–22; 82-3 ¶¶ 28–29; 82-4, ¶ 110; 86 at 24.)  Because of that alleged concealment,

7    WPEC mistakenly believed that it would be able to substantially complete the subcontract work

8    by February 28, 2017.  (Doc. No. 86 at 24) (citing Doc. Nos. 88 ¶ 4; 92 ¶ 185); (*see also* Doc. No.

9    89 ¶¶ 33–34).  DFJV concedes that CHSRA periodically communicated with DFJV about "the

10   status of parcel acquisition for ROW access," that DFJV was in communication with the County

11   of Fresno about additional ROW access at the Elkhorn Avenue location, and that all of these

12   communications were made close to the time the subcontract was executed.  (Doc. Nos. 82-1,

13   Fegan Decl. ¶¶ 21, 31–36; 82-4 ¶¶ 103–106.)  These communications demonstrate that DFJV

14   knew but failed to apprise WPEC of the fact that not all the ROWs had been acquired before the

15   subcontract was executed.  (Doc. Nos. 82-1, Fegan Decl. ¶ 21, 31–36; 82-4 ¶¶ 103–106; 92

16   ¶¶ 189–190.)

17       Concealment alone, however, is not sufficient to trigger a duty to disclose in the first

18   circumstance.  The concealed information must be material or likely to mislead.  *Bigler-Engler*, 7

19   Cal. App. 5th at 311–312 (A cause of action for non-disclosure of material facts may arise "the

20   defendant makes representations but does not disclose facts which *materially* qualify the facts

21   disclosed, *or* which render his disclosure *likely to mislead*."  (emphasis added) (citations

22   omitted)).  Whether the concealed information was material or likely to mislead does *not* depend

23   on WPEC's subjective state of mind; rather, it depends on whether "a *reasonable* man would

---

[46]  Information contained in a contract, including incorporated documents such as a construction plan, can serve as a basis for an actionable half-truth.  *See, e.g.*, *Warner Constr.*, 2 Cal. 3d at 291, 294–95 (holding that the "nondisclosure of the cave-ins and special drilling techniques used in drilling the test holes transformed" the logs contained in the plans and specifications of the contract for construction into "misleading half-truths"); *Welch v. State of California*, 139 Cal. App. 3d 546, 550, 558 (1983) (holding that the failure to disclose qualifying information "compounded the effect of misleading half-truths in the General Note" of the construction plan).

1    attach importance to its existence or nonexistence in determining his choice of action in the

2    transaction in question." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997)

3    (emphasis added) (citation omitted).  Resolution of this issue "is generally a question of fact

4    unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find

5    that a reasonable man would have been influenced by it.'"  *Id.* (citation omitted).  WPEC asserts

6    that DFJV's nondisclosure was material or likely to mislead because a reasonable person would

7    attach importance to whether all ROWs had truly been acquired in deciding whether to execute

8    the subcontract.  (Doc. Nos. 1 ¶¶ 21–22; 82-3 ¶¶ 28–29; 82-4 ¶ 110; 85 ¶¶ 95, 157; 92 ¶¶ 185,

9    90.)  To negate the element of duty, DFJV must show indisputably that no reasonable juror could

10   attach any importance to whether all ROWs had been acquired in deciding whether to execute the

11   subcontract.  DFJV's analysis of this issue as set forth in the pending motion for summary

12   judgment overlooks and, therefore, fails to address this issue.  (*See* Doc. No. 82-1 at 30–36; *see*

13   *also* Doc. No. 98.)  For this reason, DFJV has failed to meet its burden of negating the element of

14   duty and therefore has failed to show it is entitled to summary judgment on the fraudulent

15   concealment claim.

16                 b.   *Intent*

17          Despite failing to negate the element of duty, DFJV may still succeed on summary

18   judgment if it shows that there is no genuine dispute of material fact as to the element of intent.

19   In this context the question as to intent is: "Did defendant conceal or suppress the truth about

20   negative [material information] with the intent to defraud the plaintiff?"  *Boschma v. Home Loan*

21   *Ctr., Inc.*, 198 Cal. App. 4th 230, 250 (2011) (alteration in original); *see also Lovejoy v. AT&T*

22   *Corp.*, 92 Cal. App. 4th 85, 93 (2001) (*Lovejoy I*)  (the only relevant intent is "the intent to induce

23   reliance").  It is "not unusual," however, to establish intent by "circumstantial evidence," but such

24   inference of intent must *not* be "based on speculation or conjecture."  *RSB Vineyards, LLC v.*

25   *Orsi*, 15 Cal. App. 5th 1089, 1097 (2017).  Generally, "'[f]raudulent intent is an issue for the trier

26   of fact to decide.'"  *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1061 (2012) (citation omitted).

27          DFJV argues that "[t]here is no evidence, circumstantial or otherwise, even remotely

28   suggesting DFJV intended to defraud" WPEC.  (Doc. No. 98 at 9.)  Patrick Fegan, DFJV's utility

and segment manager and person designated as most knowledgeable for purposes of deposition, testified that up to the execution of the subcontract, he believed CHSRA would deliver all the ROW access to enable WPEC to substantially complete its work by February 28, 2017, and that the need to acquire additional ROWs would have only a minor impact, if any, on the expected completion date.  (Doc. No. 82-1 at 34–35; 82-4 ¶¶ 109–10, 174) (citing Doc. No. 82-1, Fegan Decl. ¶ 41).  Put another way, DFJV believed that WPEC would be able to timely complete the subcontract work and did not intend to defraud WPEC.

WPEC counters that any such belief on DFJV's part was unreasonable.  (Doc. Nos. 86 at 22–24; 92 ¶¶ 189, 193.)  WPEC submits CHSRA's periodical report of the ROW status, dated October 5, 2016, that was given to DFJV before the subcontract was executed on November 14, 2016.  (Doc. No. 86 at 22–23) (citing Doc. No. 93-2, Ex. G); (*see also* Doc. No. 93-3, Ex. R at 33:1–25 (DFJV's witness, Doris Geitner, testifying that he and Patrick Fegan, DFJV's PMK, had weekly meetings with CHSRA's staff to discuss reports on the acquisition of ROWs in October 2016)).[47]  The October 5, 2016 periodical report reflected that numerous ROW parcels were not expected to be acquired until June or July 2017—far after the designated substantial completion date of February 28, 2017.  (Doc. No. 86 at 22–23) (citing Doc. No. 93-2, Exs. G–H).  In a CHSRA monthly update provided to DFJV, dated September 26, 2016, CHSRA warned DFJV that there will be "significant delays" in the completion date of the CP2-3 project, foremost, because of the slow acquisition of the ROWs.  (*Id.*) (citing Doc. No. 93, Ex. F at 2–3, 5–6).  The circumstantial evidence presented by WPEC on summary judgment is more than sufficient to raise a triable issue of material fact as to whether DFJV reasonably believed that WPEC could substantially complete its work by February 28, 2017.  A jury must weigh that evidence and decide whether DFJV intended to fraudulently induce WPEC into signing the subcontract.

### c. *Reliance*

The court now turns to the element of reliance.  As the California Supreme Court has stated, "[r]eliance exists when the misrepresentation or nondisclosure was an immediate cause of

---

[47]  (*See* Doc. No. 82-1, Ex. C at 164, Fegan Decl. ¶ 1 (Fegan testifying that he "was a Utility Manager and Segment Manager for DFJV.").)

1   the plaintiff's conduct which altered his or her legal relations, and when without such

2   misrepresentation or nondisclosure he or she would not, in all reasonable probability, have

3   entered into the contract or other transaction." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226,

4   1239 (1995).  Thus, reliance in fraudulent concealment case (as distinct from other species of

5   fraud) is established by showing that "had the omitted information been disclosed one would have

6   been aware of it and behaved differently." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993).

7   It is *not* necessary to show reasonable reliance by "direct evidence"; evidence of the

8   "circumstances attending the transaction oftentimes affords much stronger and more satisfactory"

9   proof of reasonable reliance. *Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640, 1659 (2005)

10  (brackets omitted).  It also is *not* necessary for one to show that nondisclosure was "the sole or

11  even the predominant or decisive factor in influencing his conduct"; it is enough that the

12  nondisclosure was "a substantial factor" influencing his decision.[48]  *OCM Principal*

13  *Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 864 (2007).

14  Reliance must also be reasonable in "that (1) the matter was material in the sense that a

15  reasonable person would find it important in determining how he or she would act; and (2) it was

16  reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman*, 228 Cal. App. 4th

17  at 1194 (citations omitted).  For instance, "a plaintiff's negligence in failing to discover the falsity

18  of the statement or the suppressed information is not a defense to fraud," but if a plaintiff's

19  conduct "was manifestly unreasonable" in light of his particular knowledge and experience, "he

20  will be denied a recovery." *Id.*  "Generally, the question of whether reliance is justifiable is one

21  of fact.  But the issue 'may be decided as a matter of law if reasonable minds can come to only

22

23  [48]  WPEC concedes that even if CHSRA "had delivered all of the ROW necessary for the performance of work at Elkhorn Avenue by January 16, 2017, the work still could not have been completed by February 13, 2017 because the Issued for Construction Drawings for Elkhorn

24  Avenue weren't even issued until March 21, 2017."  (Doc. No. 85 ¶ 109.)  Thus, WPEC's position seems to be that there were at least two events that adversely impacted its ability to

25  substantially complete the subcontract in the time provided:  (1) the delay in the issuance of the drawings for the Elkhorn location; (2) and the delay in acquiring all the necessary ROWs for the

26  Elkhorn location.  Since WPEC's fraudulent concealment claim is predicated on the concealment

27  of the second event, WPEC will be required to prove at trial that the second event was the "substantial factor"—notwithstanding other factors—influencing its decision as to whether to

28  sign the subcontract—if not, the required element of reliance will not be established.

48

1    one conclusion based on the facts.'"  *Id.*

2         DJFV contends that WPEC could not have reasonably relied on the nondisclosure because

3    Ms. Villa admits she did not read the prime contract.  (Doc. No. 82-1 at 34.)  In advancing this

4    argument, however, DFJV overlooks the fact that Mr. Villa reviewed the prime contract and Ms.

5    Villa reviewed the subcontract.  *Id.* (citing Doc. No. 82-4 ¶ 96); (Doc. Nos. 88, V. Villa Decl. ¶ 4;

6    92 ¶ 182).  In any event, reliance is not predicated simply on whether WPEC had read the prime

7    contract.  The key issue is this:  if DFJV had disclosed what it purportedly knew about the delays

8    in ROW acquisition, would WPEC have "behaved differently"?  *Mirkin*, 5 Cal. 4th at 1093; *see*

9    *also id.* (holding that "it is not logically impossible to prove reliance on an omission").  Here,

10   DFJV has failed to establish that WPEC would *not* have behaved differently had DFJV fully

11   disclosed to WPEC the status of the ROW acquisition for the Elkhorn Avenue location.

12        Relatedly, DFJV also argues that WPEC's reliance on the supposed fraudulent

13   concealment (i.e., the nondisclosure of ROW delays) was *unreasonable* because WPEC failed to

14   carefully review the invitation for bids' drawings[49] of the Elkhorn Avenue location, which

15   indicated that the design had not yet been finalized.   (Doc. Nos. 82-1 at 31–32) (citing Doc. No.

16   85 ¶¶ 91, 100).  Specifically, DFJV points to the fine print in the drawings stating that the

17   drawings were "subject to change pending ongoing negotiations and service connection

18   relocations."  (Doc. Nos. 82-1 at 31–32; 82-1, Fegan Decl. ¶¶ 24, 26–27.)  DFJV also cites the

19   composite plans for the five work locations to show that the drawings were only 60% complete at

20   the time DFJV published its invitation for bids.  (Doc. No. 85 ¶ 97.)

21        WPEC counters that the "obscure note" in the Elkhorn Avenue drawings "cannot be

22   reasonably interpreted to communicate to WPEC" that all ROWs had not been acquired or would

23   not be timely acquired to enable WPEC to substantially complete its work by February 28, 2017.

24   (Doc. No. 86 at 18.)  WPEC's argument is well-taken.  Construing the evidence in light most

25   favorable to WPEC, and given how complex and voluminous invitation-for-bids packet and

26   subcontract are (totaling hundreds of pages), the court cannot say, as a matter of law, that

27   _____

28   [49]  When WPEC submitted its bid to DFJV, it certified that it had "examined all bid documents,
     subcontract agreements, and other related documents."  (Doc. No. 85 ¶ 51.)

1    WPEC's failure to take note of these minute details in the Elkhorn Avenue drawings was

2    "manifestly unreasonable in the light of his own intelligence or information," "preposterous," or

3    "so patently and obviously false that he must have closed his eyes to avoid discovery of the

4    truth." *OCM*, 157 Cal. App. 4th at 865.  Moreover, even if WPEC had read the fine print, a

5    reasonable juror could find that the tentativeness of the drawings and composite plans reflected

6    the tentativeness of the design—*not* the status of the ROWs, and that it was reasonable for WPEC

7    to rely on DFJV's half-truth about the acquisition of the ROWs.

8         DFJV further argues that WPEC's reliance was unreasonable for another reason—because

9    the status of the ROW acquisition was publicly available, and that WPEC could have easily

10   inquired of AT&T or the CHSRA about the status of the ROW acquisition.  (Doc. No. 82-1 at 32–

11   33.)  DFJV submits pages from the Fresno County's public website, *currently* showing the status

12   of the ROWs in the county area.[50]  (*Id.*) (citing *id.*, Ex. B (Smiley Decl.)).  WPEC, however,

13   persuasively disputes the relevancy of CHSRA's and AT&T's knowledge of the ROW

14   acquisition.  (Doc. No. 85 ¶ 108.)  Even assuming DFJV's position is accurate, "[t]he mere fact

15   that [the undisclosed] information exists somewhere in the public domain is by no means

16   conclusive" that reliance on fraudulent concealment was unreasonable.  *Vega*, 121 Cal. App. 4th

17   at 295; *see also Terstate Restoration, LLC v. Seaman*, No. SACV 13-00706 DOC (RNBx), 2014

18   WL 12569347, at *8 (C.D. Cal. July 9, 2014) ("California law appears unwilling, even in the case

19   of more sophisticated parties, to find public dissemination alone enough to defeat a claim of

20   fraudulent concealment."  (citation omitted)).  Accordingly, DFJV has failed to meet its burden

21   on summary judgment with regard to this element of WPEC's fraudulent concealment claim.

22        Because of DFJV's failure to establish a lack of genuine dispute of material fact as to any

23   of the three elements (duty, intent, or reliance) of WPEC's first and third claims based on

24   fraudulent concealment, summary judgment as to those claims must be denied.

25   /////

26

---

27   [50]  WPEC counters that DFJV's evidence is insufficient to show that the information on the
     Fresno County's public website *was* available to the public at the time WPEC signed the

28   subcontract.  (Doc. No. 85 ¶ 108.)

1      ## 2. Fourth Claim Based on the Unfair Competition Law

2      The California Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or

3      fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and

4      makes fraudulent concealment actionable under the statute. *Daniel v. Ford Motor Co.*, 806 F.3d

5      1217, 1225 (9th Cir. 2015) (quoting Cal. Bus. & Prof. Code § 17200). DFJV does not argue why

6      summary judgment should be entered in its favor on WPEC's fourth claim under the UCL; it

7      seems DFJV presumes that plaintiff's UCL claim would be dismissed if it prevailed on summary

8      judgment as to plaintiff's first and third claims. (*See* Doc. No. 82-1 at 30–36.) Because the court

9      has identified genuinely disputed issues of material fact as to WPEC's first and third claims, the

10     court also finds that the granting of summary judgment in favor of DFJV as to WPEC's UCL

11     claim is not warranted.

12     **E. WPEC's Remedies**

13     Under Federal Rule of Civil Procedure 56(g), "[i]f the court does not grant all the relief

14     requested by the motion, it may enter an order stating any material fact—including an *item of*

15     *damages* or other relief—that is not genuinely in dispute and treating the fact as established in the

16     case." Fed. R. Civ. P. 56(g) (emphasis added). Accordingly, DFJV next argues that WPEC

17     cannot recover lost profits, home overhead, and penalties and interests as damages in this action

18     and seeks partial summary judgment in its favor as to those aspects of the claim for damages.

19     (Doc. Nos. 82-1 at 36–43; 98 10–11.) The court ultimately finds DFJV's arguments in this regard

20     to be unpersuasive. WPEC is entitled to seek those items of damages either as tort damages

21     under its fraudulent concealment claim or as contract damages pursuant to its breach-of-contract

22     claim. To provide the necessary context, the court will briefly outline the basic principles of

23     contract and tort damages at issue below.

24     Because fraudulent concealment is a tort claim, WPEC is entitled to compensation "for *all*

25     the detriment proximately caused thereby, whether it could have been anticipated or not." Cal.

26     Civ. Code § 3333 (emphasis added). "Detriment is a loss or harm suffered in person or property."

27     Cal. Civ. Code § 3282. "There is no fixed rule for the measure of tort damages under Civil Code

28     section 3333. The measure that most appropriately compensates the injured party for the loss

1    sustained should be adopted." *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.*, 88 Cal.

2    App. 4th 439, 446–47 (2001) (citation omitted). This broad measure of tort damages is consistent

3    with the object of tort law "to compensate the victim for injury suffered" and "to vindicate social

4    policy." *Applied Equip.,* 7 Cal. 4th at 514, 516.

5          By contrast, "[c]ontract damages, unlike damages in tort (California Civil Code § 3333),

6    do *not* permit recovery for *unanticipated* injury." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona*

7    *Unified Sch. Dist.*, 34 Cal. 4th 960, 969 (2004) (emphasis added). Contract damages are limited

8    to "the amount which will compensate the party aggrieved for all the detriment proximately

9    caused [by the breach of an obligation arising from contract], or which, in the ordinary course of

10    things, would be likely to result therefrom." Cal. Civ. Code § 3300 (alteration in original). This

11    amount *cannot* be greater than the amount "he could have gained by the full performance [of

12    contract] thereof on both sides." Cal. Civ. Code § 3358 (alteration in original). Thus, the

13    maximum contract damages WPEC may recover from DFJV's alleged breach of contract is

14    capped by the benefit of the "contractual bargain." *Lewis Jorge*, 34 Cal. 4th at 968.

15          Certainly, WPEC is not entitled to double recovery (i.e., tort damages plus contract

16    damages) for the same injury by pleading both tort and breach-of-contract contract claims. *See*

17    *DuBarry Internat., Inc. v. Sw. Forest Indus., Inc.,* 231 Cal. App. 3d 552, 564 (1991) ("[I]t would

18    seem plain that recovery could not be twice had simply because the facts would support recovery

19    upon either [tort or contract] theory."). If WPEC prevails on both its fraudulent concealment and

20    breach-of-contract claims at trial in this case, it may elect to receive either tort or contract

21    damages, but not both for the same injury. *See Denevi v. LGCC, LLC*, 121 Cal. App. 4th 1211,

22    1218 (2004) ("Broadly speaking, an election of remedies is the choice by a plaintiff to an action

23    of one of two or more coexisting remedial rights, where several such rights arise out of the same

24    facts, but the term has been generally limited to a choice by a party between inconsistent remedial

25    rights, the assertion of one being necessarily repugnant to or a repudiation of the other."); *see,*

26    *e.g.*, *Waffer Internat. Corp. v. Khorsandi*, 69 Cal. App. 4th 1261, 1280–81 (1999) (reversing the

27    trial court's grant of summary judgment "on election of remedies grounds" because the tort and

28    breach-of-contract claims must be decided on their merits first).

1          1.   Whether the Economic Loss Rule Bars WPEC's Recovery of Lost Profits

2          DFJV argues that California's "economic loss rule" bars WPEC from recovering lost

3   profits, a type of economic loss, on WPEC's fraudulent concealment claim.  (Doc. No. 82-1 at

4   40.)  According to DFJV, the California economic loss rule requires WPEC to recover lost profits

5   "on a contract theory and cannot avail itself of tort claims."  (*Id.*)  However, the court finds this to

6   be an overgeneralized characterization of the California's economic loss rule that is not applicable

7   here.

8          California's "economic loss rule requires a [plaintiff] to recover in *contract* for *purely*

9   economic loss due to disappointed expectations, *unless* he can demonstrate harm above and

10  beyond a broken contractual promise."  *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979,

11  988 (2004) (emphasis added) (citation omitted).  Economic loss is the "damages for inadequate

12  value, costs of repair and replacement of the defective product or *consequent loss* of profits—

13  *without* any claim of personal injury or damages to other property . . . ."  *Id.* at 988 (emphasis

14  added) (quoting *Jimenez v. Superior Court*, 29 Cal. 4th 473, 482 (2002)).  "Physical damage to

15  property and personal injury, however, are not considered to be economic loss."[51]  *Stearman v.*

16  *Centex Homes*, 78 Cal. App. 4th 611, 617 (2000) (citation omitted).  As relevant here, "[t]he

17  economic loss rule has been applied to bar a plaintiff's *tort* recovery of economic damages *unless*

18  such damages are accompanied by some form of physical harm (i.e., personal injury or property

19  damage)."  *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 777 (1997) (emphasis

20  added).  The rule is designed to "prevent the law of contract and the law of tort from dissolving

21  one into the other."  *Robinson Helicopter*, 34 Cal. 4th at 989.

22         DFJV reads the decision in *Robinson Helicopter* as barring WPEC from seeking to

23  recover lost profits (i.e., economic loss) as a tort damages, and requiring WPEC to instead recover

24  lost profits as contract damages.  (Doc. No. 82-1 at 40–41.)  This reading of *Robinson Helicopter*

---

25  [51]  In the seminal case, *Seely v. White Motor Co.*, 63 Cal. 2d 9 (1965), the California Supreme

26  Court constructed a "distinction between 'tort recovery for physical injuries and warranty
    recovery for economic loss.'"  *Stearman v. Centex Homes*, 78 Cal. App. 4th 611, 617 (2000)

27  (citing *Seely*, 63 Cal. 2d 9 at 18).  It is from this legal distinction that the economic loss rule first
    emerged.  *See id.* at 616 (noting that *Seely* is "widely recognized as the progenitor of the

28  economic loss rule").

1   is misguided.  In *Robinson Helicopter*, the California Supreme Court recognized from its long

2   line of precedents establishing that economic loss may be received as tort damages, even in

3   breach-of-contract cases, in several instances

4      where a breach of duty directly causes physical injury; for breach of
   the covenant of good faith and fair dealing in insurance contracts; for

5      wrongful discharge in violation of fundamental public policy; or
   where the contract was *fraudulently induced*.  "[I]n each of these

6      cases, the *duty* that gives rise to tort liability is either completely
   independent of the contract *or* arises from conduct which is both

7      intentional and intended to harm."

8   *Robinson Helicopter*, 34 Cal. 4th at 989–90 (emphasis added) (citations omitted).  Applying its

9   precedents, the California Supreme Court reasoned that it had "held that a party's contractual

10  obligation may create a legal duty and that a breach of that duty may support a tort action."  *Id.* at

11  993 (emphasis added).  On this basis, the state high court held that "the economic loss rule does

12  not bar Robinson's fraud and intentional misrepresentation claims because they were independent

13  of Dana's breach of contract."  *Id.* at 991.  The long-standing precedents re-affirmed in *Robinson*

14  *Helicopter* apply here.  Of the multiple exceptions recognized in *Robinson Helicopter*, fraudulent

15  inducement of contract is the relevant exception here because WPEC claims that it was

16  "fraudulently induced" into signing the subcontract as a result of DFJV's concealment.  Given

17  WPEC's theory of liability, WPEC may obtain lost profits in the form of tort damages, and such

18  damages are *not* barred by the economic loss rule under the holding in *Robinson Helicopter*.  *See*

19  *id.* at 989–90.  It follows that partial summary judgment in favor of DFJV on WPEC's claim for

20  lost profits damages based on the economic loss rule is not warranted.

21     2.  <u>Whether WPEC's Lost Profits May be Recoverable Based on the Evidence</u>

22     As a matter of general principle, "damages for the loss of prospective profits are

23  recoverable where the evidence makes reasonably certain their occurrence and extent."  *Grupe v.*

24  *Glick*, 26 Cal. 2d 680, 693 (1945); *see also Estate of Kampen*, 201 Cal. App. 4th 971, 991–92

25  (2011) ("'It is fundamental that 'damages which are speculative, remote, imaginary, contingent,

26  or merely possible cannot serve as a legal basis for recovery.'"  (brackets and citation omitted)).

27  WPEC seeks to recover $636,000 in net lost profits.  (Doc. No. 85 ¶ 176; *see also* Doc. No. 1

28  ¶ 28.)  DFJV contends that such damages are, as a matter of law, categorically too speculative and

1    uncertain to be recoverable in this case.  (Doc. Nos. 82-1 at 36, 38–41; 98 at 10–11.)  The court is

2    unpersuaded by this argument.  Lost profit damages are *not* categorically prohibited here.  *See S.*

3    *C. Anderson, Inc. v. Bank of Am.*, 24 Cal. App. 4th 529, 533 (1994) (acknowledging that the

4    California Supreme Court has recognized lost profits as ground for recovery in construction

5    cases.  (citing *Warner Constr.*, 2 Cal. 3d 285, 303)).

6          In California, a plaintiff's recovery "may include loss of anticipated profits" if its

7    "established business has been injured."  *Fibreboard Paper Prod. Corp. v. E. Bay Union of*

8    *Machinists, Local 1304, United Steelworkers of Am., AFL-CIO*, 227 Cal. App. 2d 675, 702

9    (1964).  Such "damages are based on net profits, as opposed to gross revenue."  *Meister v.*

10   *Mensinger*, 230 Cal. App. 4th 381, 397 (2014) (citation omitted).  "'Net profits are the gains

11   made from sales 'after deducting the value of the labor, materials, rents, and all expenses,

12   together with the interest of the capital employed.'"  *Parlour Enterprises*, 152 Cal. App. 4th at

13   287 (citations omitted).  The net lost profits of "an established business may be recovered if their

14   *extent* and *occurrence* can be ascertained with reasonable certainty; once their existence has been

15   so established, recovery will not be denied because the amount cannot be shown with

16   mathematical precision."  *Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 398 (2019)

17   (emphasis added) (quoting *Sargon Enterprises, Inc. v. Univ. of S. California*, 55 Cal. 4th 747, 774

18   (2012)).  Expert testimony supported by tangible evidence; historical data of past business

19   volumes; data of the profits lost by comparable businesses operating under similar conditions

20   may, independently or in combination, may be relied upon to reasonably ascertain the amount of

21   net lost profits.  *See id.* (citations omitted); *Parlour Enterprises*, 152 Cal. App. 4th at 288

22   (citation omitted).  Thus, lost profits are recoverable as a matter of law if there is sufficient

23   evidence presented supporting the award of such damages.

24         Nonetheless, DFJV contends that WPEC indisputably cannot establish its lost profit

25   damages at trial with any reasonable certainty.  (Doc. Nos. 82-1 at 38–41; 98 at 10–11.)  The

26   argument is uncompelling.  Summary judgment on lost profits based on the insufficiency of

27   evidence is appropriate only if the "uncontradicted evidence demonstrates that the award is

28   insufficient as a matter of law."  *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 649 (2018).  If

1   there is a dispute over the amount of net lost profits, that "is a question of fact" for the jury to

2   decide.  *Orozco*, 36 Cal. App. 5th at 400.  Here, there are conflicting expert opinions before the

3   court on summary judgment as to the reasonable certainty and amount of WPEC's purported net

4   lost profits.

5          WPEC has submitted the report compiled by Terry Lloyd, a certified public accountant

6   and financial analyst, to prove WPEC's loss of net profits.  (Doc. No. 93, Ex. T at 101, 103–05,

7   116–22, 124.)  Therein, Lloyd uses two different methods of calculation to arrive at two

8   estimations of net profit damages between February 2017 and May 2018:  "$625,929 for the

9   extended field overhead costs" and, alternatively, "$599,193 for extended home office costs."[52]

10  (*Id.*)  Lloyd's estimates are based on his expertise and historical data of WPEC's past earnings,

11  expenses, loans, and equipment contracts from 2015 to 2018.  (*Id.*)  California courts have

12  accepted Lloyd's methodology and use of historical data as reliable in ascertaining the reasonable

13  amount of net lost profits.  *See Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002)

14  ("[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business

15  context when the expert opinion is supported by tangible evidence with a 'substantial and

16  sufficient factual basis' rather than by mere 'speculation and hypothetical situations.'" (citation

17  omitted)); *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 890

18  (2000) ("The extent of such [net lost profit] damages may be measured by 'the past volume of

19  business and other provable data relevant to the probable future sales.'"  (alteration in original));

20  *Guntert v. City of Stockton*, 55 Cal. App. 3d 131, 143 (1976) ("Historical data supply an

21  acceptable basis for ascertaining lost or diminished benefits suffered by an established

22  business."); *cf. Schroeder v. Auto Driveaway Co.*, 11 Cal. 3d 908, 921 (1974) ("The opinion of an

23

24  [52]  Lloyd uses the May 2018 date in the calculation because he believes that is the date DFJV
    terminated the subcontract.  (*See* Doc. No. 93-3, Ex. T at 103.)  DFJV disagrees and asserts that
25  the date of termination was March 13, 2018.  (Doc. No. 82-4 ¶ 45.)  Having reviewed the
    evidence cited by WPEC to support the assertion that May 2018 was termination date, the court
26  finds that the evidence is not corroborative.  (*See* Doc. No. 85 ¶ 45) (citing Doc. No. 82-4, Exs.
    45, 71).  This factual error, however, is not fatal to WPEC's opposition to summary judgment as a
27  trier of fact can weigh the evidence and decide on a lower amount of lost net profits using a
    different date.
28

1    owner of personal property is in itself competent evidence of the value of that property, and

2    sufficient to support a judgment based on that value.").  Thus, construing this evidence in light

3    most favorable to WPEC, the court cannot say that the evidence WPEC has presented on

4    summary judgment with respect to its lost profit damages is insufficient as a matter of law.

5            In an attempt to overcome WPEC's evidence in the form of the Lloyd report, DFJV

6    submits the declaration of Michelle Mangan, a certified expert in public accounting and financial

7    forensics.  (Doc. No. 82-1 at 40) (citing Ex. D at 502–11).[53]  Mangan opines, among other things,

8    that Lloyd's calculation is inconsistent in several respects, and that it fails to account for WPEC's

9    limited bonding capacity and the negative impact of $400,000 in equipment acquisitions.  (*Id.*,

10   Ex. D at 501–02, Mangan Decl. ¶¶ 10, 11, 15, 17, 19); *but see Schroeder v. Auto Driveaway Co.*,

11   11 Cal. 3d 908, 920 (1974) ("The absence of a complete and fully accurate list of damages does

12   not bar plaintiffs' recovery" of net lost profits.).  Mangan also contests Lloyd's account of

13   WPEC's past profitability and opines that WPEC's lost profits cannot be reasonably ascertained.

14   (Doc. No. 82-1, Ex. D at 501–02, Mangan Decl. ¶ 19.)  Even so, Mangan's declaration only

15   disputes the calculations made and conclusions reached in the Lloyd report and, in doing so,

16   merely establishes a genuine dispute of material fact.  *See also Anderson*, 477 U.S. at 255 ("The

17   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

18   favor.").  Whether Lloyd report is to be believed in light of Mangan's declaration, or whether a

19   reasonably certain amount in lost profits can be inferred therefrom, is a "question of fact"—and

20   "it is for the jury to fix the amount of damages." *IIG Wireless*, 22 Cal. App. 5th at 648; *see also*

21   *Smith v. Coleman*, 46 Cal. App. 2d 507, 514 (1941) ("The determination of the amount of general

22   damages which will compensate an injured party for injuries suffered involves the exercise of a

23   broad discretion by the trier of facts.").  Clearly it is not appropriate for the court to weigh the

24   conflicting expert opinions and decide the facts with respect to lost profit damages on summary

25   judgment.

26   */////*

27

28   ---
     [53]  DFJV mistakenly cites the Mangan declaration as Exhibit "C," but it is actually Exhibit "D."
     (*See* Doc. No. 82-1 at 40, Ex. D at 501–02, Mangan Decl.)

1    DFJV also argues that under two California court decisions WPEC cannot recover lost

2    profit damages as a matter of law.  (Doc. Nos. 82-1 at 38–42; 98 at 10–11.)  This argument fails,

3    however.  DFJV first argues that in *S. C. Anderson*, 24 Cal. App. 4th 529, the Court of Appeal

4    purportedly "curtailed the outer limit of proximate cause to stop short of reaching lost profits in

5    construction contracts."  (Doc. No. 82-1 at 40–42.)   In *S. C. Anderson*, the plaintiff, a general

6    contractor, appealed the trial court's decision granting a motion for nonsuit brought by the

7    defendant, a bank.  *S. C. Anderson*, 24 Cal. App. 4th at 533, 535.  In reaching its decision, the

8    trial court determined that, as a matter of law, "the evidence presented by the plaintiff [was]

9    insufficient to permit a jury to find in his or her favor."  *Id.* at 534 (alteration in original).  The

10   California Court of Appeal affirmed the ruling and found that the plaintiff's "testimony that [it]

11   was an excellent company, as well as argument regarding its profitability," was insufficient to

12   establish lost profit damages.  *Id.* at 536–37.  Here, WPEC has certainly come forward on

13   summary judgment with specific evidence much more compelling than mere "testimony that it is

14   an excellent company" and arguments regarding its profitability.  As determined above, Lloyd's

15   estimate of WPEC's lost profits based on his expertise and historical data have been found to be

16   reliable and acceptable as a matter of law by California courts.  For these reasons, the court finds

17   the decision in *S. C. Anderson* to be distinguishable from the present case.

18       The court also finds DFJV's reliance on the decision in *Lewis Jorge*, 34 Cal. 4th 960, to

19   be misplaced.  (Doc. No. 82-1 at 38–40.)  In *Lewis Jorge*, the plaintiff, a contractor, sued the

20   defendant, a school district, for breach of contract on a school construction project and sought to

21   recover $3 million in lost profits.  *Lewis Jorge*, 34 Cal. 4th at 965.  The issue on appeal was

22   whether the lost profit damages were anticipated or a "probable result of the defendant's breach"

23   under California Civil Code § 3300.  *Id.* at 968, 970–71.  The California Supreme Court

24   concluded that while the "termination of the school construction contract was the first event in a

25   series of misfortunes that culminated in [the plaintiff's] closing down its construction business,"

26   "[s]uch disastrous consequences, however, are not the natural and necessary result of the breach

27   of every construction contract involving bonding."  *Id.* at 977.  The reasoning in *Lewis Jorge* does

28   not extend to the situation presented here because WPEC is entitled to seek lost profits as tort

1   damages under California Civil Code § 3333 and, thus, would be not limited by the doctrine of

2   foreseeability[54] under contract law as the plaintiff in *Lewis Jorge* was.  *See id.* at 968–69

3   (stressing that "[c]ontract damages, unlike damages in tort, do not permit recovery for

4   unanticipated injury" under California Civil Code § 3300); *Miles v. Deutsche Bank Nat'l Tr. Co.*,

5   236 Cal. App. 4th 394, 409 (2015) ("It would be strange, however, to apply a contract measure of

6   damages to a tort.").

7       For all of the foregoing reasons, the court concludes that DFJV has failed to meet its

8   burden on summary judgment.  Thus, there remains a genuine disputed issue of material fact as to

9   if *and* how much WPEC is entitled to lost profit damages.

10              3.  WPEC's Tax Penalties and Interests

11      In addition to lost profits, WPEC also seeks $35,506.51 in consequential damages for

12   penalties, fees, and interest paid to the Internal Revenue Service ("IRS") as a result of DFJV's

13   alleged fraudulent concealment.  (Doc. Nos. 1 at 14; 85 ¶ 180.)  In its motion for summary

14   judgment, DFJV argues that this type of damages is always unforeseeable and impossible to

15   approximate as a matter law.  (Doc. No. 82-1 at 42–43); *but see Eckert Cold Storage, Inc. v. Behl*,

16   943 F. Supp. 1230, 1234 (E.D. Cal. 1996) (holding that under § 3333, the plaintiffs were entitled

17   to *tort* damages "due to the tax liability, if they can prove that this liability was caused by

18   [defendant's] negligent or fraudulent advice and would not otherwise have been incurred.").  To

19   support its position, DFJV relies on three decisions—*DCD Programs, Ltd. v. Leighton*, 90 F.3d

20   1442 (9th Cir. 1996), *Freschi v. Grand Coal Venture*, 767 F.2d 1041 (2d Cir. 1985); *Depalma v.*

21   *Westland Software House*, 225 Cal. App. 3d 1534 (1990)—all of which the court finds to be

22   disguisable from this case for the reasons explained below.

23      In *Freschi,* a securities fraud case, the issue was whether "compensation for hoped-for tax

24   savings" was an "impermissible award of damages arising from an expectation interest" under the

25   Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b–5.  *Freschi*, 767 F.2d at

26

---

27   [54] *See Lewis Jorge*, 34 Cal. 4th at 977 ("[T]he breaching party 'is not required to compensate the
     injured party for injuries that it had no reason to foresee as the probable result of its breach when

28   it made the contract.'"  (citations omitted)).

1043, 1051.  The Second Circuit affirmed the district court's ruling that such compensation was

not permitted under the SEC's rule.  *Id.* at 1051.  The case before this court is not one involving

alleged securities fraud; WPEC is not seeking damages under an SEC's rule; and DFJV cites no

authority suggesting that the court must draw a parallel between *Freschi* and this case where none

is apparent.  The second case relied upon by DFJV, *DCD Programs*, is another securities fraud

case, where the Ninth Circuit held that back taxes and interest paid to the IRS were not

recoverable under federal law.  *DCD Programs*, 90 F.3d at 1451–52.  That decision does not

guide the court here because, just as is the case with *Freschi,* federal law simply does not govern

WPEC's consequential damages claim here.

The third case relied upon by DFJV, *Depalma*, is equally inapposite.  At issue in that case

was the trial court's decision to *not* admit evidence at trial to show whether IRS tax benefits were

proximately caused by, or likely to result from, a breach of contract claim brought under

California Civil Code § 3300.[55]  *Depalma*, 225 Cal. App. 3d at 1539–45.  On appeal, the state

appellate court affirmed the trial court's decision because the evidence was too "complicated,

time consuming and confusing" for the *jury* to rely upon at trial compared to its probative value

under California Evidence Code § 352.  *Id.* at 1544–45.  An evidentiary ruling in a different case

on a different record is clearly not pertinent to this case.  Moreover, while the plaintiff's contract

damages in *Depalma* were limited by the parties' expectations at the time of contract under

§ 3300, in this case WPEC is not bound by the same limitation.  As discussed above, WPEC is

entitled to seek tort damages under California Civil Code § 3333 for the tax penalties and

interests without the limitation of foreseeability under contract law.  *See Miles*, 236 Cal. App. 4th

at 409 ("It would be strange, however, to apply a contract measure of damages to a tort.").

Accordingly, the decision in *Depalma* is not pertinent to the court's resolution of the pending

motion for summary judgment.

/////

---

[55] "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable." *Erlich*, 21 Cal. 4th at 550 (citations omitted).

1    4.   WPEC's Delay Damages

2       Finally, DFJV contends that WPEC's claim for delay damages is prohibited by the

3    subcontract.  (Doc. No. 82-1 at 37, 42.)  Under the terms of the subcontract (including

4    incorporated documents), WPEC waived "recovery of, any damages suffered by reason of delays,

5    hindrances, or interferences of any nature, and an extension of time for completion of the Work,"

6    as well as "home office overhead."  (*Id.*) (citing Doc. No. 85 ¶¶ 166, 179).  Nonetheless, the court

7    concludes that summary judgment on WPEC's claim for delay damages is inappropriate because

8    DFJV has failed to prevail on WPEC's fraudulent concealment claim on summary judgment.  If it

9    were to prevail on its fraudulent concealment claim at trial, WPEC "can *either* rescind the

10   contract and restore the consideration, *or* can affirm the contract and recover damages for fraud."

11   *Vill. Northridge Homeowners Assn. v. State Farm Fire & Cas. Co.*, 50 Cal. 4th 913, 923 (2010)

12   (emphasis added).  "Rescission extinguishes the contract, terminates further liability, and restores

13   the parties to their former positions by requiring them to return whatever consideration they have

14   received." *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1145 (2010).  Because recission would

15   release WPEC from the delay-damages provision in the subcontract, and WPEC has yet to try the

16   case and elect its choice of remedy should the trial proves successful for WPEC, the resolution of

17   WPEC's claim for delay damages on summary judgment is inappropriate at this time.

18                                          **CONCLUSION**

19       In light of the foregoing, the court declines to enter summary judgment on WPEC's

20   complaint or DFJV's cross-complaint.  A partial judgment on WPEC's first, third, or fourth

21   claim, or any items of damages, is also inappropriate.  Accordingly, DFJV's motion for summary

22   judgment or partial summary judgment (Doc. No. 82) is DENIED in its entirety.

23   IT IS SO ORDERED.

24   Dated:   **April 18, 2021**                          _____

25                                          UNITED STATES DISTRICT JUDGE

26

27

28

61